Ricardo GONZALES, Appellant,

v.

The HEARST CORPORATION d/b/a the
Houston Chronicle Publishing
Company, Appellee.

No. 14–94–00966–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

Sept. 12, 1996.

H. Victor Thomas, Robert S. Bennett, Houston, for appellant.

Stacy W. Beasley, William W. Ogden, Houston, for appellee.

Before YATES, FOWLER and O'NEILL, JJ.

## OPINION

FOWLER, Justice.

Appellant, Ricardo Gonzales ("Gonzales"), appeals from a final judgment in favor of appellees, the Hearst Corporation and the Houston Chronicle Publishing Company (the "Chronicle"). Finding no evidence the Chronicle knowingly printed appellant's name falsely or with reckless disregard as to its truthfulness, the trial court granted appellees' motion for instructed verdict, and entered a take nothing judgment. In one point of error, appellant asserts the trial court erred in granting the appellees' motion for instructed verdict. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

In the early morning hours of October 31, 1989, three off-duty Houston police officers, Alex Gonzales, Alexander Romero, and Robert Gonzales, were involved in a car chase in which Ida Lee Delaney was shot and killed. Later that day, the Chronicle reported the story and accurately identified the three off-duty officers as Alex Gonzales, A.R. Romero, and R.C. Gonzales. On November 1, 1989, the Chronicle did a follow-up story and properly identified two of the officers, but improperly identified the third as *Ricardo* Gonzales. A third story, on November 2, 1989, correctly identified the officers as Alex Gonzales, Alexander Romero, and *Robert* Gonzales.

Appellant's lawyer wrote the Chronicle, mistakenly assuming the Chronicle had published a correction of the November 1, 1989, story. In its reply, the Chronicle offered to

run a correction. Appellant never responded to the Chronicle's offer, and no correction was printed. Four years later, appellant hired a new lawyer and demanded the Chronicle run a correction. The Chronicle printed a correction on May 8, 1994.

Appellant sued the Chronicle, alleging injuries arising from the article's incorrect identification of him as one of the officers involved in the incident. At the close of appellant's evidence, the trial court granted an instructed verdict in favor of the Chronicle.

## POINT OF ERROR

In one point of error appellant claims the trial court erred in granting appellees' motion for instructed verdict. He argues three factors which he contends establish that the Chronicle acted with actual malice: (1) the source relied upon by the Chronicle reporter denied giving the reporter the erroneous name that appeared in the November 1 article, and thus the reporter had no "source" for his wrongful identification of Ricardo Gonzales; (2) the Chronicle refused to publish a correction of its defamation of Ricardo Gonzales until four years after its original publication; and (3) the Chronicle published three different names in three days which proves malice or reckless disregard for the truth.

## STANDARDS OF REVIEW

### Defamation of a Public Official

██ The parties in this case stipulated before trial that Gonzales is, and when the article was published was, a public official. To prevail at trial on a defamation claim, a public official must prove that the defendant (1) published a statement, (2) that was defamatory about a public official, and (3) that the false statement was made with actual malice. *New York Times v. Sullivan,* 376 U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964); *Carr v. Brasher,* 776 S.W.2d 567, 569 (Tex.1989). Actual malice is not ill will; it is the making of a statement with knowledge that it is false, or with reckless disregard of whether it is true. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 328, 94 S.Ct. 2997,

3001, 41 L.Ed.2d 789 (1974). "Reckless disregard" is defined as a high degree of awareness of probable falsity, and the plaintiff must present "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968); *Carr,* 776 S.W.2d at 571.

██ It is not enough for the jury to disbelieve the defendant's testimony. To prevail on a defamation claim, appellant, as a public official, is required to prove by *clear and convincing evidence* that the Chronicle acted with actual malice. *See Gertz,* 418 U.S. at 342, 94 S.Ct. at 3008; *Carr,* 776 S.W.2d at 571; *Casso v. Brand,* 776 S.W.2d 551, 558 (Tex.1989). Showing the defendant made a mistake or erred in judgment is not enough. *See Time, Inc. v. Pape,* 401 U.S. 279, 290, 91 S.Ct. 633, 640, 28 L.Ed.2d 45 (1971). To prove malice the plaintiff must offer proof of the defendant's state of mind at the time of publication. *Sherman v. Times Herald Printing Co.,* 671 S.W.2d 700, 703 (Tex. App.—El Paso 1984, no writ); *see also Foster v. Upchurch,* 624 S.W.2d 564, 566 (Tex. 1981).

### Instructed Verdict

██ When reviewing an instructed verdict, an appellate court usually considers all the evidence in the light most favorable to the party against whom the verdict was instructed, discarding all contrary evidence and inferences. *Szczepanik v. First Southern Trust Co.,* 883 S.W.2d 648, 649 (Tex. 1994); *Jones v. Falcon,* 875 S.W.2d 29, 30 (Tex.App.—Houston [14th Dist.] 1994, writ denied); *Hagans v. Woodruff,* 830 S.W.2d 732, 737 (Tex.App.—Houston [14th Dist.] 1992, no writ). Every reasonable intendment deducible from the evidence is to be indulged in the non-movant's favor. *Trenholm v. Ratcliff,* 646 S.W.2d 927, 931 (Tex.1983). The court is to determine whether any evidence of probative force exists to raise fact issues on the material questions presented in the case. *Edlund v. Bounds,* 842 S.W.2d 719, 723 (Tex.App.—Dallas 1992, writ denied); *C & C Partners v. Sun Exploration & Prod.*

*Co.,* 783 S.W.2d 707, 712 (Tex.App.—Dallas 1989, writ denied).

An instructed verdict is proper if (1) a specifically indicated defect in the non-movant's pleading makes the pleading insufficient to support a judgment; (2) the evidence proves conclusively the truth of fact propositions that, under the substantive law, establish the right of the movant or negate the right of the non-movant to judgment; or (3) the evidence is insufficient to raise a fact issue as to one or more fact propositions that must be established for the non-movant to be entitled to judgment. *Fort Worth State School v. Jones,* 756 S.W.2d 445, 446 (Tex. App.—Fort Worth 1988, no writ). An instructed verdict is warranted when the evidence is such that no other verdict can be rendered and the moving party is entitled to judgment as a matter of law. *C & C Partners,* 783 S.W.2d at 712. When the evidence raises a material issue of fact, or when reasonable minds may differ as to the truth of the controlling facts, an instructed verdict is *not* warranted, and it would be error for the trial court to instruct a verdict. *Graziadei v. D.D.R. Mach. Co., Inc.,* 740 S.W.2d 52, 55–56 (Tex.App.—Dallas 1987, writ denied). If there is any conflicting evidence of probative value in the record, the jury must determine the issue. *White v. Southwestern Bell Tel. Co., Inc.,* 651 S.W.2d 260, 262 (Tex.1983).

We have cited the well-settled rules used to review an instructed verdict. However, the instant case presents a unique situation in that it concerns the constitutional standard of liability for a public official and involves the "alleged trespass across the line between speech unconditionally guaranteed and speech which may legitimately be regulated." *New York Times,* 376 U.S. at 285, 84 S.Ct. at 728 (quoting *Speiser v. Randall,* 357 U.S. 513, 525, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958)). We must consider whether the heightened burden of proof borne by a public official at the trial of a defamation case, as well as other constitutional considerations, alter the normal standard of review we use when reviewing a judgment on a directed verdict.

Appellant contends the proper standard of review is the standard used to review a normal directed verdict, citing *Kelly v. Diocese of Corpus Christi,* 832 S.W.2d 88 (Tex.App.—Corpus Christi 1992, writ dismissed w.o.j.).[1] He argues that we do not consider his burden of presenting clear and convincing evidence until after the case goes to the trier of fact. This approach is true to the directed verdict standard of review traditionally used in Texas, but ignores "the constitutional standard of liability for public figures, as established by the Supreme Court in *New York Times* and restated in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)." *Tavoulareas v. Piro,* 759 F.2d 90, 103–04 (D.C.Cir.1985), *reh'g granted; vacated in part on other grounds,* 763 F.2d 1472 (D.C.Cir.1985), *on reh'g,* 817 F.2d 762 (D.C.Cir.1987), *cert. denied,* 484 U.S. 870, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987).

The Chronicle urges us to take the directed verdict standard of review of "any evidence of probative value" and engraft it on to the public official's heightened burden of clear and convincing evidence. This approach dictates that before evidence of actual malice would be of probative value, it must be clear and convincing. The Chronicle also asks this court to perform an independent review of the evidence to determine whether actual malice is proven with convincing clarity. *See Bose Corp. v. Consumers Union of United States,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984); *New York Times,* 376 U.S. at 285, 84 S.Ct. at 728–29; *Doubleday & Co., Inc., v. Rogers,* 674 S.W.2d 751, 755 (Tex.1984); *Casso,* 776 S.W.2d at 558; and *New York Times* 376 U.S. at 280, 84 S.Ct. at 726. The standard the Chronicle advocates is applied in federal case law. Apparently, no Texas State Court has addressed the issue.

In considering this issue, we are mindful of the Texas Supreme Court's refusal to follow federal law and inject a public figure plaintiff's burden of proof into summary judgment proceedings. *Casso,* 776 S.W.2d at 555–57. However, Texas law and federal law have

---

1. Although *Kelly* is a directed verdict case, the plaintiff in *Kelly* was not a public figure and so

would not have to prove actual malice at trial by *clear and convincing evidence.*

different philosophies about, and procedures for, summary judgments. Federal courts use summary judgment proceedings to further the goal of a just, speedy, and inexpensive determination of every action. Texas courts disfavor summary judgments and use them "merely 'to eliminate patently unmeritorious claims and untenable defenses.'" *Id.; see also City of Lancaster v. Chambers,* 883 S.W.2d 650, 657 (Tex.1994). The same is not true for directed verdicts. The federal standard of review and the standard used in Texas are virtually the same. Arguably then, the standard of review adopted by the federal courts in public official defamation cases should apply here.

We find this standard of review articulated in *Tavoulareas,* a public figure libel case. In *Tavoulareas,* the D.C. Circuit Court found that when a motion for judgment notwithstanding the verdict was filed, the non-moving party was entitled to have the evidence viewed in the light most favorable to him. The court noted that the trial court and the court of appeals had neither the *"duty"* nor " the *authority* to weigh credibility or to choose among legitimate inferences" in favor of the moving party except "when no contrary inference can legitimately be drawn." *Tavoulareas,* 759 F.2d at 105–106. The court further held that

> A district judge on motion for judgment n.o.v., or an appellate judge on review, must examine the evidence to see whether, if all permissible inferences were drawn in the plaintiff's favor and all questions of

credibility were resolved in his behalf, the evidence would then demonstrate by clear and convincing proof that the libelous material was published with actual malice.

*Id.* at 106. This is the standard of review we would use if we were to adopt the federal standard.[2]

■ Reviewing the evidence in the light most favorable to appellant, we must determine whether the evidence and its reasonable inferences establish that the Chronicle published the article with knowledge that Ricardo Gonzales was not involved in the incident or acted with reckless disregard of the truth or falsity of this fact.[3] *Tavoulareas,* 759 F.2d at 106–109. Whether we use the federal standard or the Texas standard of review for directed verdicts, we must perform an independent review of the evidence.

Having reviewed the record with an eye to both standards, we find no evidence of actual malice—under either the federal standard, which places a higher burden on appellant, or the usual directed verdict standard, which places a lower burden on appellant. *See White v. Southwestern Bell Tel. Co.,* 651 S.W.2d at 262; *see also Tavoulareas,* 759 F.2d at 103–04. The evidence we considered is set forth below. As required by either standard, we accepted only the undisputed facts or appellant's version of disputed facts, avoiding all evaluations of credibility, and crediting all permissible inferences to appellant.

---

2. This intermediate standard of review is not totally foreign to Texas courts, having been used in other cases in which the plaintiff's burden is clear and convincing. However, there is a split among the courts of appeals as to whether the higher burden of proof should impact the standard of review, *see e.g., D.O. v. Texas Dep't of Human Servs.,* 851 S.W.2d 351, 353 (Tex.App.—Austin 1993, no writ); *Neal v. Texas Dep't of Human Servs.,* 814 S.W.2d 216, 222 (Tex.App.—San Antonio 1991, writ denied); *Neiswander v. Bailey* 645 S.W.2d 835, 836 (Tex.App.—Dallas 1982, no writ), and, in fact, the Supreme Court, rejected an intermediate standard, saying that Texas has only two standards of review: factual sufficiency and legal sufficiency. *Meadows v. Green,* 524 S.W.2d 509, ·510 (Tex.1975). This court has refused to interject the heightened burden of proof into the standard of review, *Oadra v. Stegall,* 871 S.W.2d 882, 892 (Tex.App.—Houston [14th Dist.] 1994, no writ). We question whether

*Oadra* and other cases which hold similarly are controlling since they did not involve a threat to the First Amendment right of free speech.

3. *See National Association of Government Employees, Inc. v. National Federation of Federal Employees,* 844 F.2d 216, 220 (5th Cir.1988) (holding in a libel case involving a public figure that a court must decide independently of the jury "whether the record as a whole presents clear and convincing proof of actual malice—whether or not the trier of fact was the district judge or a jury and whether or not it found actual malice"); *Bartimo v. Horsemen's Benevolent & Protective Ass'n.,* 771 F.2d 894, 896–98 (5th Cir.1985) (stating *Bose* standard of independent review applicable even when the court or jury finds no actual malice on the part of the defendant).

## THE EVIDENCE

The testimony at trial focused on 1) how the police department spokesman disseminated information, 2) who he briefed, 3) where the Chronicle reporter obtained his information, 4) when the Chronicle found out its error, and 5) what the newspaper did to correct its mistake.

The incident in question was considered a "breaking news story" by both the Houston Chronicle and the Houston Post. Both papers carried front-page articles on the event on the 31st of October and the following two days. This lawsuit resulted because both papers misidentified one participant in the incident. On October 31, both papers identified the police officers as Alex Gonzales, who was the driver and shooter, R.C. Gonzales, and A.R. Romero. The following day both newspapers identified the officers as Alex Gonzales, *Ricardo* Gonzales, and Alexander Romero.[4] On November 2, both papers again correctly referred to the officers as Alex Gonzales, *Robert* Gonzales, and Alexander Romero.

The morning of the incident, the Houston Police Department immediately dispatched a public information officer to the scene. The incident was a potential public relations nightmare. The officers and the deceased were minorities. There were questions as to whether two of the officers had been drinking, and because the officers were in a personal car, whether it was apparent to the deceased that the men pursuing her were policemen.

Al Baker, a public information officer, spent approximately an hour and a half investigating the scene. He then went to the hospital where Alex Gonzales was in surgery. After an hour and a half, he left without speaking to Alex Gonzales and returned to the Houston Police Department (HPD) around 9:00 a.m. Baker spoke to internal affairs and found out two officers he did not know, Robert Gonzales and Alexander Romero, were involved in the incident.

Baker made the first official release of information in time for the local television stations' noon broadcasts. Baker denied speaking to The Chronicle reporter until after the noon interviews. Further, he unequivocally denied releasing the name "Ricardo Gonzales" to the reporter because he knows Ricardo Gonzales personally, and knew the officer was not involved in the incident. Because two of the officers involved had the same surname, and two had the same first name, Baker testified that he was being extremely careful releasing the officers' names to the media.

James Campbell, a seasoned reporter, covered the police beat for the Chronicle. Before joining the Chronicle, Campbell had worked at the Post, and was considered a thorough reporter by the editors at the Chronicle. Even Officer Baker, who worked with him frequently, considered Campbell to be fair, even-handed and accurate. A two-time winner of the Associated Press Managing Editor Award, Campbell was on the editorial board of the Chronicle at the time of trial.

Hearing about the incident the morning it happened, Campbell went directly from his house to the scene. He obtained what information he could at the scene, but did not learn the names of the officers involved in the chase. Campbell proceeded to the police department to obtain more information, and testified that he spoke with Baker around 9:00 a.m.

At that time the Chronicle had two afternoon editions, and Campbell was working under a short deadline. The latest an article could be put in the computer for these editions was either 10:15 a.m. or 11:30 a.m. He obtained Alex Gonzales' name and the first initials and last names of the other two officers. Campbell then went to the deceased's neighborhood to interview her neighbors. Later, he returned to the police department, made additional phone calls, and proceeded to the civil service department for more information.

The story was of great significance to the community in general, and to Campbell personally. He considered it one of the three

4. The Post used the name *Ricardo* Gonzales in its news article, but correctly listed the name as *Robert* Gonzales in a column written by one of its columnists.

most important stories he had followed at the Chronicle. The Delaney shooting followed on the heels of several other incidents which had strained relations between certain minority communities. It involved questionable actions by at least one off-duty minority police officer that resulted in the death of a black woman. As a journalist, Campbell felt it was important to cover not only the facts of the incident itself, but other details and aspects of the story. Unable to get the full names of the officers who were passengers in the car for the October 31 edition, Campbell did obtain the first names, Ricardo and Alexander, for the November 1 article. At some point before the third article, Campbell learned that Officer Gonzales' first name was *Robert*, not Ricardo. The November 2 article contained the correct name.

By the time of trial Campbell had disposed of his reporter's notebook containing source names and notes he took for the story. The reporter testified that he goes through as many as ten notebooks a week and that it is his practice to get rid of them.[5]

The first article ran the afternoon of the shooting and narrowly focused on the incident itself. It contained the details of what happened before and after the shooting as well as indirect quotes from Officer Baker and HPD Homicide Sergeant Jim Ramsey, two police department spokesmen. Campbell's story deadline was only hours after the event—10:15 a.m. for the first edition and 11:30 a.m. for the later edition.

The November 1 article was much longer and more detailed. It described the events leading up to the shooting, included statements about the officers' thought processes as they followed Delaney, why they continued to follow her, and why they considered her dangerous. It also contained quotes from a witness to the shooting, quotes from Homicide Sergeant Steve Clappart, and comments from others investigating the incident.

Campbell included the reactions of Delaney's neighbors, information about the decedent's previous run-ins with the police, and problems Alex Gonzales had with the police department. The article mentioned Ricardo Gonzales and Alexander Romero twice in passing, once as passengers in the car with Gonzales, and later stating that neither of them had been drinking. Even though the name Ricardo Gonzales appeared twice, the focus of the article was on Alex Gonzales and Ida Lee Delaney. The identity and involvement of the two other officers was a minor part of the article.

Campbell testified unequivocally and without contradiction that he did not entertain any doubts about the accuracy of the names he put in his article. He stated that if he doubted his facts, it was his practice to call his desk at the Chronicle and tell them the story contained an error. He swore that he would have made such a call if he thought his article was inaccurate.

Officer Ricardo Gonzales testified that he learned about the incident when he arrived for work the morning of October 31. Many officers in the parking lot were talking about the shooting. The identity of two of the officers was common knowledge, but there was speculation as to whether Robert or Ricardo Gonzales was involved. Gonzales corrected his fellow officers' misconceptions and reported to work. Ironically, because death threats had been made against Alex Gonzales, appellant was assigned to guard the wounded officers' hospital room.

When he reported for work the morning of November 1, appellant learned that the papers had listed him as one of the passengers in the car with Alex Gonzales. As soon as he completed his shift at the hospital he sat down to call the papers.[6] Appellant testified that he looked up the number for the Chronicle in the phone book and called the newspaper. Meeting with limited success, appellant

5. Campbell testified that he obtained the names Ricardo and Alexander from Baker which, as we have already noted, Baker denies. We have disregarded this part of Campbell's testimony since it contradicts Baker.

6. At this time The Chronicle had two morning editions and two afternoon editions. The November 1 edition Gonzales introduced at trial was the second afternoon edition. The only testimony or evidence at trial showing that Gonzales' name was also in one of the morning editions was his testimony that he saw his name when he reported for work.

finally said he needed to talk with James Campbell about the Ida Lee Delaney case. Campbell came on the line within seconds.[7] Appellant informed Campbell that he was Ricardo Gonzales and that Campbell had wrongly identified him as being involved in the incident. He told Campbell that he wanted his name out of the article immediately, he wanted a retraction immediately, and he wanted the retraction on the front page. Campbell sarcastically responded, "yeah, yeah," and hung up on appellant. Gonzales also telephoned the Post, talked with the author of their Delaney article, and demanded the same from him. The Post printed a correction on November 10. Although the Chronicle knew of the Post correction, it did not print a retraction.

On December 15, appellant's lawyer sent a letter of complaint to the Chronicle and discussed his demand for a retraction. The letter mistakenly stated that the Chronicle had printed a retraction "only after the passage of one (1) week's time" and did not specifically request that a retraction be printed. The letter suggested that the paper contact its insurance carrier about its coverage for slander, libel, and copyright infringement, and threatened the Chronicle with suit if it did not respond to the lawyer's letter within 10 days. The Chronicle responded to the letter on January 2, 1990, and suggested that appellant consult with his lawyer and let the Chronicle know if he wanted a retraction. That same day lawyers for the Chronicle and appellant spoke on the phone. During their phone conversation, appellant's lawyer apparently told the Chronicle's lawyer that Gonzales might not want a retraction. The Chronicle heard nothing further from appellant about a retraction. Four years later, during the deposition of the Chronicle's managing editor, appellant's lawyer told the Chronicle that Gonzales wanted a retraction. As a result of this conversation and ensuing letters, the paper printed a retraction, although not the one Gonzales requested.

7. Campbell testified that he never spoke with Gonzales. The reporter claimed that appellant could not have reached him at the paper because he would have been at his office at the Houston

## SUFFICIENCY OF THE EVIDENCE

In reviewing appellant's claim, we must be mindful that appellant must present sufficient evidence to permit the conclusion that Campbell or the Chronicle entertained serious doubts as to the truth of their publication of the name Ricardo Gonzales in the November 1, 1989, article. *St. Amant,* 390 U.S. at 731, 88 S.Ct. at 1325–26.

Campbell's testimony at trial that he had no doubts about the accuracy of his story when he printed it is undisputed. *See Carr,* 776 S.W.2d at 571 (stating that affidavits of defendants in which they stated that they never had any doubts and certainly no serious doubts about the truth of the statements they made were sufficient to support a summary judgment when no controverting proof was submitted). However, such a claim can be refuted by circumstantial evidence, and appellant offers three pieces of evidence in rebuttal.

First, Baker unequivocally denies giving Campbell the name Ricardo Gonzales. Campbell, on the other hand, claimed to have gotten the name Ricardo Gonzales from Baker. We must disregard Campbell's testimony, take Baker's version as true, and conclude that Campbell's alleged source did *not* give him the erroneous name. Appellant argues that this version of the facts supports the inference that Campbell must have fabricated the name he used in the story. We do not agree that this is a reasonable inference to draw from the evidence before us.

The undisputed testimony at trial depicted Campbell as a thorough, fair, even-handed, and *accurate* reporter. The record shows Campbell spoke with at least four different police officers and three different departments about the incident. The fact finder is allowed to make only *reasonable, not unreasonable* inferences from the evidence. *See, e.g., Tavoulareas,* 817 F.2d 762, 796 (D.C.Cir. 1987) (op. on reh'g). Based on the record, it is *unreasonable* to infer that Campbell fabricated the details of his story. A juror or judge might reasonably infer from the evi-

Police Department. We have disregarded his testimony because it contradicts appellant's testimony.

dence that Campbell was mistaken about his source, or negligent, but not that he had *willfully* published false information in his story.

Appellant refers us to a Fifth Circuit holding that a jury could conclude a reporter fabricated a statement when the alleged source for the statement did not contain the statement itself. *Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1070 (5th Cir.1987) (citing *Carson v. Allied News Co.*, 529 F.2d 206, 212–13 (7th Cir.1976)). We agree that, in certain special circumstances, a court may be able to infer reckless fabrication. However, this is not such a case. In *Carson*, a reporter essentially admitted to making up detailed conversations between the plaintiff, Johnny Carson, and NBC executives about the Tonight Show's move from New York to Hollywood. *Carson*, 529 F.2d at 212. The *Carson* court did not infer fabrication simply because the alleged source did not contain the false information. Unlike the defendant in *Carson*, Campbell has a reputation for thoroughness, and appeared to be thorough in his research. Additionally, the Post *also* used the name *Ricardo Gonzales* in its November 1 article, a factor that points to an inference other than fabrication. We see no evidence which would allow a reasonable inference that Campbell simply invented the name Ricardo Gonzales used in the story or entertained serious doubts about the truth or accuracy of the name.

 Appellant also claims we can infer actual malice because the Chronicle refused to print a retraction when Gonzales demanded one in his 1989 telephone call to the newspaper, but did print one four years after the incident. Refusal to print a retraction is evidence of an action *after* the publication, but it can lend support to a claim that reckless disregard or knowledge existed *at* the time of publication. As authority for his position, appellant cites another Fifth Circuit case. *See Golden Bear Distributing Systems of Texas, Inc. v. Chase Revel, Inc.*, 708 F.2d 944, 950 (5th Cir.1983). In *Golden Bear*, the plaintiff contacted the magazine after the article came out, offered to prove that it was innocent of any wrongdoing, and requested a retraction. Even though the author of the

article had notes showing that she *knew* the information in her article was *wrong*, the magazine refused to print a retraction. We do not think that *Golden Bear* stands for the proposition that a refusal to print a retraction, by itself, can be clear and convincing evidence of actual malice.

Although the Chronicle did not print a retraction when appellant telephoned in 1989, it did not *refuse* to print a retraction. The newspaper offered to print a retraction two months after the incident, but never heard back from appellant's attorney. The Chronicle printed a retraction once appellant's attorney asked for one. This case is clearly distinguishable from *Golden Bear* on the facts. The evidence in *Golden Bear* showed that the reporter *knew at the time of publication* that the article was *wrong*, but flatly refused to print a retraction.

 Appellant offered the testimony of two expert witnesses to support his contention of actual malice. One expert stated that the Chronicle's refusal to print a retraction when it knew that it had made a mistake was a reckless disregard for the truth. Both of appellant's experts testified that the Chronicle should have printed a retraction immediately upon realizing that a misstatement was made. However, this testimony is objective in nature and does not assist the trier of fact in determining the *subjective* truth of whether Campbell and/or the Chronicle entertained serious doubts as to the accuracy of the names published in the November 1 article. An expert's testimony "is not probative of actual malice because [their] opinion relates to a reckless disregard for a standard of objectivity, not for the truth." *Harris v. Quadracci*, 856 F.Supp. 513, 518–519 (E.D.Wis.1994).

 Even Campbell's sarcastic comment when appellant called to demand a retraction may be evidence of spite or displeasure but it is not, by itself, evidence of a willingness to print a falsehood. *See Tavoulareas*, 817 F.2d at 795. The U.S. Supreme Court addressed this issue when examining the reaction of a *Consumer Reports* engineer who

> had made a mistake [in a published critique of a product] and when confronted

with it, he refused to admit it and steadfastly attempted to maintain that no mistake had been made—that the inaccurate was accurate. That attempt failed, but the fact that he made the attempt does not establish that he realized the inaccuracy at the time of publication.

*Bose Corp.*, 466 U.S. at 512, 104 S.Ct. at 1966.

Campbell may have responded sarcastically when confronted with his error, but his reaction alone does not establish that he was willing to print a falsehood, or that he knew of the error or had serious doubts about the accuracy of the article at the time of publication. *Id., Tavoulareas,* 817 F.2d at 795; *cf. Rebozo v. Washington Post Co.,* 637 F.2d 375, 381–82 (5th Cir.1981) (stating that fact issue on actual malice was raised because of (1) an internal memo recognizing article might need to be rewritten and (2) fact that reporter chose the worst of three equally potential assumptions).

Finally, appellant submitted expert testimony that printing three different names in three stories over three days, as the Chronicle did here, showed a reckless disregard for the truth. Appellant also argues, without any reference to caselaw, that this fact is some evidence of actual malice. Expert testimony does not assist the jury in making the subjective determination of whether Campbell or the Chronicle actually entertained serious doubt about the accuracy of the names in the November 1 article. *Harris,* 856 F.Supp. at 518–19.

Appellant argues that these three factors are conclusive evidence of actual malice. We disagree. Furthermore, we agree with the Chronicle that one additional piece of information must be factored into our consideration of the evidence of actual malice.

The police considered the incident a public relations nightmare, and the press recognized it as an important, fast-breaking news story, with wide reaching social implications. Campbell, a veteran reporter, considered the Delaney story one of the three most important pieces he had covered for the Chronicle. The reporter's job was to gather as much information as possible about the incident and people involved in a very short time.

This was a fast breaking news story with looming deadlines. The error, when considered in context, points not to actual malice, but to mistake or negligence. *See Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (considering the necessity for rapid dissemination, dispatches sent by reporter that were internally consistent did not give the slightest hint of a severe departure from accepted publishing standards); *see also Hunt,* 720 F.2d at 645 (stating that article in case was *not* hot news and therefore reporter had sufficient time to check out the information contained in the article).

### CONCLUSION

We have examined the record with great care and find a complete absence of affirmative evidence—either direct or circumstantial—of actual malice on the part of Campbell or the Chronicle. We conclude that *no* evidence exists, clear and convincing or otherwise, to support a finding of actual malice. We affirm the judgment of the trial court.