**Jianguang WANG and Yellow Emperor Communications, Inc. D/B/A Houston Chinese Press, Appellants,**

v.

**David TANG, Appellee.**

**No. 01–08–00009–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

June 5, 2008.

1. *See* Tex.Code Crim. Proc. Ann. art. 36.01(a)(1)    (Vernon 2007).

David P. Lein, Peter D. Kennedy, Graves, Dougherty, Hearon & Moody, PC, Austin, TX, for Appellant.

Micheal D. Sydow, Sydow & McDonald, L.L.P., Houston, TX, for Appellee.

Panel consists of Chief Justice RADACK and Justices KEYES and HIGLEY.

## OPINION

LAURA CARTER HIGLEY, Justice.

In this interlocutory, accelerated appeal, we determine whether the trial court prop-erly denied the motion for summary judgment filed by the *Houston Chinese Press*[1] against David Tang's libel claims. Because Tang, who is a limited purpose public figure, did not present sufficient summary judgment evidence to raise an issue of material fact on the element of actual malice to support his libel claim, we conclude that the *Houston Chinese Press* was entitled to summary judgment.

We reverse and render.

### Background

The Chinese Civic Center ("the CCC") is a non-profit organization promoting and offering social, cultural, and educational activities for the Houston Chinese community. The CCC serves an important and integral role in that community.

In 2005, the CCC assisted in bringing the Beijing People's Art Theater to Houston to perform the play *Teahouse*. After the Houston performance, concerns arose in the Chinese community regarding the CCC's financial accounting relating to the performance. A concern also arose in the community regarding whether the CCC had sufficient funds to continue operating.

On April 22, 2006, the CCC held a press conference to introduce its new officers and board members and to discuss CCC accounting and financial issues, including those relating to the *Teahouse* performance. At the beginning of the press conference, David Tang was introduced as new vice-chair of the CCC. Members of the Chinese community and the Chinese-language media, including the *Houston Chinese Press's* editor-in-chief, Jianguang Wang, attended the meeting. During the press conference, the board members responded to questions posed by the audi-

---

1. We refer to media defendants, Jianguang Wang and Yellow Emperor Communications, Inc. d/b/a Houston Chinese Press, collectively as "the Houston Chinese Press," unless otherwise indicated.

ence regarding the CCC's finances and operations. Some in the audience were critical of the board's management and, at times, the atmosphere of the press conference was tense.

Tang acted as the master of ceremonies at the press conference, but did not answer any of the audience's questions. At the end of the press conference, Tang made the following closing remarks:

Lastly, I only want to say one word. What? Last year we had the celebration of the 60th anniversary of the victory of the Anti–Japanese War. They had a saying at that time. What is that saying? I would like to use it today. The saying is this: Facing the invasion of the Japanese Devils, they said this saying "as long as we are alive, we shall not lose one inch of ground." I want to use this saying as a conclusion to today's meeting. **So long as the new board of directors are serving, so long as we get the support from our warmhearted friends in the community, we, the Chinese Civic Center, for sure, for sure, who already have ten years of brilliant service and for sure, will have ten more years of brilliant service. I thank everybody. The conference is ended. Thank you all.**

(Emphasis added.)

On April 30, 2006, the *Houston Chinese Press* published an article ("the article") entitled, "Guizi [translated: "Japanese Invaders"] are Coming: Board of Civic Center Have Vowed to Resist Japanese." The article reported some of the questions posed by the audience, criticized the adequacy of the board's responses, and highlighted accounting discrepancies relating to the CCC's finances. The article also quoted the portion of Tang's of closing remarks referencing the invasion by the

"Japanese Devils," but did not include the remainder of Tang's remarks, which are bolded above. In reference to Tang's closing remarks, the article stated as follows, in part, and as translated from Chinese to English:[2]

"Japanese Invaders" certainly refers to the enemies in the war in which Japanese invaded China, the Japanese Guizi who looted, massacred, raped and committed all manners of crimes on Chinese people for as long as eight years. David Tang used the "invasion of Japanese invaders" as an analogy, then he had "fight to the death in defense of one's front," then he had teamwork of the board of [the] Chinese Civic Center team up, etc. If we deduct [sic] in this way, David is having the community as the battlefield, moreover, the battlefield of fighting against Japanese, and having the Chinese Civic Center as the front, moreover, the front to fight against Japanese invaders. People who attended the news press meeting on that day feel puzzled in and after the meeting. Are the "Japanese Invaders, referred [to] by David Tang, the news media, or the presenting persons who support, care for and make donations to [the] Chinese Civic Center? If in the eyes of some directors of [the] Chinese Civic Center, the Chinese in the community actually become the "Japanese Invaders," who cannot live under the same sky due to hatred, all persons in the Houston Chinese Community other than [the] Chinese Civic Center, the front, will be Japanese and "Chinese Civic Center" will become an anti-Japanese organization accordingly and matter-of-factly. Meanwhile, the fund to fight against

---

2. We acknowledge the grammatical and syntactical errors in this translation. We have

chosen to set forth the translation with only a few minor corrections to aid the reader.

Japanese needs to be obtained from Japanese Invaders.

People feel compelled to ask again, that while [the] Chinese Civic Center reiterate since its inception that it is to be owned by all, now all were put in categories of "Japanese Invaders" for just asking a few questions eyed by the community....

. . . .

CCC is the home of the overseas Chinese in Houston. To love one's home is the heritage of many Chinese. We hope there is a good management of CCC. Only those [who] love their home will denounce the unlawful acts of the management. Even though we are considered as "Japanese Invaders," we still love our home.

. . . .

Don't regard those who raised questions to CCC as "trouble makers." Do not regard those people that love CCC as Japanese Invaders while consider himself as the heroes on Lang Yanshan. Do not put the interest of someone in the CCC board above the whole interest of CCC. Otherwise, if the "Japanese Invaders" are coming, can you hold your own front? Please remember, to hold on to the front will not be you guys, it will be the whole community who were smeared to be "Japanese Invaders" that love the Chinese People.

Eleven months later, Tang filed suit against Wang and the *Houston Chinese Press,* asserting a libel claim based on the April 30 article. Specifically, Tang alleged that, by failing to publish the entirety of his closing statement from the press conference, the *Houston Chinese Press* intentionally misrepresented and "distorted" his remarks to mean that Tang was referring to the Chinese community and the media as "Japanese Invaders." Tang claimed that, when heard in its entirety, his closing remark could only be interpreted to mean:

"That working together with the members of the community, the Chinese Civic Center would move forward into the next decade of dedicated service to the members of the Houston Overseas Chinese Community." Tang vehemently denied that, by his closing remarks, he was referring to the Houston Chinese community as "Japanese Invaders" or "guizi."

The *Houston Chinese Press* moved for summary judgment on Tang's libel claim. Among the grounds for summary judgment was the *Houston Chinese Press's* assertion that it had not published the alleged defamatory statements with actual malice.

Tang amended his petition to include libel claims based on other statements in the April 30 article besides those relating to the Japanese invasion reference. The *Houston Chinese Press* supplemented its motion for summary judgment to assert that the new allegations of libel were time-barred. Following a hearing, the trial court granted the *Houston Chinese Press's* motion for summary judgment regarding the additional libel claims added by Wang in his amended petition. The trial court denied the *Houston Chinese Press's* motion for summary judgment as to Wang's libel claims arising from those statements in the article asserting that Wang had called those in the Houston Chinese community, who questioned the board "Japanese Invaders" or "guizi."

The *Houston Chinese Press* filed this interlocutory appeal challenging the trial court's denial of its motion summary judgment relief. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(6) (Vernon Supp. 2007).

## Traditional Summary Judgment Standard and Elements of Claim

We review a summary judgment ruling pursuant to a de novo standard. *Provi-*

*dent Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215 (Tex.2003). When conducting our review, we take the nonmovant's competent evidence as true, indulge every reasonable inference in favor of the nonmovant, and resolve all doubts in favor of the nonmovant. *Diversicare Gen. Partner, Inc. v. Rubio,* 185 S.W.3d 842, 846 (Tex.2005). A defendant may prevail by traditional summary judgment if it defeats at least one essential element of the plaintiff's claim as a matter of law. *See Science Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 911 (Tex.1997).

■ To establish his defamation claim, Tang, a limited purpose public figure,[3] must show that the *Houston Chinese Press* published the allegedly defamatory statements with actual malice. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974); *WFAA–TV, Inc. v. McLemore,* 978 S.W.2d 568, 571 (Tex.1998). The *Houston Chinese Press* may prevail on its motion for summary judgment by offering evidence negating the actual malice element as a matter of law. *See Hearst Corp. v. Skeen,* 159 S.W.3d 633, 637 (Tex.2005); *Huckabee v. Time Warner Entm't Co. L.P.,* 19 S.W.3d 413, 420 (Tex.2000). Once the *Houston Chinese Press* meets this burden, then Tang must present evidence raising a genuine issue of material fact regarding actual malice to avoid summary judgment. *Huckabee,* 19 S.W.3d at 420.

## Constitutional Actual Malice

### A. Applicable Principles

■ In defamation suits involving public figures, the actual malice standard serves to protect innocent but erroneous speech on public issues, while deterring "calculated falsehoods." *See Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 120 (Tex.2000). A showing of "actual malice" in a defamation suit requires proof that the defendant made a statement with knowledge that it was false or with reckless disregard of whether it was true or false. *New Times, Inc. v. Isaacks,* 146 S.W.3d 144, 162 (Tex.2004); *Huckabee,* 19 S.W.3d at 420. Reckless disregard is a subjective standard, focusing on the defendant's state of mind. *Isaacks,* 146 S.W.3d at 162; *Bentley v. Bunton,* 94 S.W.3d 561, 591 (Tex.2002). Specifically, the plaintiff must establish that the defendant in fact entertained serious doubts as to the truth of his publication, or had a high degree of awareness of the probable falsity of the published information. *Isaacks,* 146 S.W.3d at 162 (citing *Bentley,* 94 S.W.3d at 591) (internal quotations omitted). A public figure may rely on circumstantial evidence to prove a defendant's state of mind. *Bentley,* 94 S.W.3d at 591.

### B. Wang's Evidence Negating Actual Malice

■ To negate the actual malice element, the *Houston Chinese Press* offered the affidavit of its editor-in-chief, defendant, Jianguang Wang. Affidavits from interested witnesses will negate actual malice as a matter of law only if they are "clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted."[4] Tex.R. Civ. P. 166a(c); *see Huckabee,* 19 S.W.3d at 424. In a

---

**3.** Tang does not dispute on appeal that he is a limited purpose public figure.

**4.** The phrase "could have been readily controverted" does not mean that the summary judgment proof could have been easily and conveniently rebutted, rather, it indicates that the testimony could have been effectively countered by opposing evidence. *Trico Technologies Corp. v. Montiel,* 949 S.W.2d 308, 310 (Tex.1997).

defamation suit, a defendant is permitted to testify by affidavit about his subjective state of mind and his belief about the challenged statement's truth or falsity. *See Casso v. Brand,* 776 S.W.2d 551, 559 (Tex.1989). But, to negate actual malice, a defendant's affidavit must establish his belief in the challenged statement's truth and provide a plausible basis for his belief. *Huckabee,* 19 S.W.3d at 424. Wang's affidavit meets these requirements.

First, Wang's affidavit establishes his belief in the truth of the allegedly defamatory statements. Wang testified that, at the time of publication, he "knew of no statement" in the article that was "false" and "had no doubts as to the truth of any statements" in the article. More specifically, Wang testified, in relevant part,

> I was surprised and shocked to hear Mr. Tang refer to the Japanese invasion of China at the end of this confrontational meeting. I understood Mr. Tang's comment to be directed towards those members of the audience and media who were raising questions about the *Teahouse* performance and the CCC's explanation of its finances and accounting. In my opinion, the only thing that Mr. Tang could have been referring to in his comment about the Japanese invasion were the people raising questions about the CCC, nearly all of whom were members of the Chinese community.
>
> . . . .
>
> I understood Mr. Tang's words in the context of the contentious meeting that was coming to a close. I understood Mr. Tang's words regarding the "Japanese invaders" and the "defense of our position" to be referring to the people who were questioning the CCC's actions and his own defense of the CCC's positions. I understood Mr. Tang to be comparing the people who were questioning the CCC to China's enemies.

Perhaps Mr. Tang's statements were exaggeration or hyperbole, but I had no doubt that his statement was referring to the persons who had questioned the CCC's actions.

The affidavit also established that Wang had a plausible basis for his belief that the allegedly defamatory statements were true. Wang stated that he attended the CCC press conference and heard Tang make the statement referencing the Japanese invasion of China. Wang explained the historical significance to the Chinese community of Tang's reference to the Japanese invasion. Wang described his underlying thought process to show why he believed that the *Houston Chinese Press's* statements are truthful. Specifically, he explained that Tang's comments came at the end of a "confrontational meeting" between the audience, "nearly all of whom were members of the Chinese community," and the CCC board, of whom Tang was a member. In this context, it appeared to Wang that the audience members, including the media present, were the Japanese enemy to whom Tang referred in his closing statement.

Wang also testified that he heard other members of the audience express shock at Tang's comments, including one woman who, upon hearing the reference to the Japanese invasion exclaimed, "My God!" Wang averred in his affidavit that this reaction indicated to him that others in the audience also interpreted Tang's reference to the Japanese invasion as he did.

Wang buttressed his testimony with the affidavits of five other audience members, who also heard Tang's remarks. These five individuals interpreted Tang's comments in the manner reported by the *Houston Chinese Press.* Specifically, four of the affiants understood Tang to be equating the audience's questions regarding the CCC's operations and finances to

the Japanese invasion of China, to be comparing the audience, who were members of the Chinese-language media and the Chinese community, to the "Japanese invaders," and to be likening the CCC board to the defending Chinese army. The fifth affiant testified that he believed that Tang had "confused the audience with the Japanese invaders."

Wang further supported his testimony by offering two articles from other Chinese-language newspapers, which discussed the press conference. One of the articles, which appeared in the *Chinese Times,* described the tension that arose during the press conference between those asking questions and the CCC board. Referring to Tang's remark that, during the Japanese invasion, Chinese soldiers said that "we'll fight to the death in defense of our position," the article noted that Tang "said this probably to express his determination to do a job well. But some media were not happy with what he said. One reporter said: 'We have all turned into Japanese devils and puppet troops.'" The other article, which appeared in the Chinese-language newspaper the *World Journal,* describe the contentious nature of the press conference.

Based on the summary judgment evidence offered, we conclude that Wang negated the actual malice element. Wang's affidavit is "clear, positive, and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted." *See* Tex.R. Civ. P. 166a(c). In his affidavit, Wang does not simply deny actual malice; rather, he provides a detailed explanation of his state of mind and describes the basis for his belief. Accordingly, the burden shifts to Tang to raise an issue of material fact regarding actual malice. *See Freedom Newspapers of Tex. v. Cantu,* 168 S.W.3d 847, 853 (Tex.2005) (concluding

that affidavits from publisher and copy desk editor averring that neither had knowledge of inaccuracies or any reason to doubt accuracy of articles was evidence that newspaper acted without malice and shifted burden to plaintiff to produce contrary evidence to avoid summary judgment); *Hearst,* 159 S.W.3d at 637 (reasoning that author's affidavit stating that he believed article was true and accurate based on his extensive research negated actual malice and burden shifted to plaintiffs to raise fact issue); *Isaacks,* 146 S.W.3d at 164–65 (reversing denial of media defendants' motion for summary judgment on ground that affidavits of editor-in-chief, managing editor, and author negated actual malice as matter of law).

## C. Tang's Evidence Regarding Actual Malice

### 1. *"Omission" of Part of Tang's Statement*

■ As mentioned above and as reflected in the summary judgment evidence, Tang made the following statement at the close of the press conference:

Lastly, I only want to say one word. What? Last year we had the celebration of the 60th anniversary of the victory of the Anti–Japanese War. They had a saying at that time. What is that saying? I would like to use it today. The saying is this: Facing the invasion of the Japanese Devils, they said this saying "as long as we are alive, we shall not lose one inch of ground." I want to use this saying as a conclusion to today's meeting. **So long as the new board of directors are serving, so long as we get the support from our warmhearted friends in the community, we, the Chinese Civic Center, for sure, for sure, who already have ten years of brilliant service and for sure, will have ten more years of brilliant service. I**

**thank everybody. The conference is ended. Thank you all.**

The evidence shows that the *Houston Chinese Press* published only part of Tang's statement; it did not publish the bolded portions of Tang's remarks.

In his affidavit, Tang explained his statement as follows:

The slogan is a commonly used slogan, even today. The meaning of the slogan is that, as long as we work together and continue to persevere, we can overcome any obstacle. As the last sentences make abundantly clear, the reasons I said this was to conclude on a positive note: that as long as the Chinese Civic Center and its warmhearted friends in the community work together, the Center will continue to provide service to the Chinese Community in the future, and will even provide better service. When I said my statements I heard round of applause. I did not hear any booing.

■ For summary judgment purposes, we assume the truth of Tang's assertion that he intended his statement to be a call for the Chinese community to unify to overcome the financial difficulties faced by the CCC. *See Cantu*, 168 S.W.3d at 855 Nonetheless, to avoid summary judgment, Tang is still required to offer evidence establishing that the *Houston Chinese Press* acted with actual malice in its publication. *See id.*

In this regard, Tang contends that the "alteration" of his statement by the *Houston Chinese Press* is itself evidence raising an issue of material fact regarding actual malice. Tang asserts that, by omitting the above-bolded language, the *Houston Chinese Press* "altered" and "distorted" Tang's statement and changed its meaning "entirely." Tang contends that the *Houston Chinese Press* knowingly and intentionally omitted the last part of his remarks to create a false impression. Tang points out that the *Houston Chinese Press* used the "altered" version to support its claim that Tang called the Chinese community "guiza" or "Japanese Devils."

Tang reasons that the act of knowingly publishing only part of the quote is itself evidence that the *Houston Chinese Press* acted with actual malice. More specifically, Tang avers that actual malice is shown when "a defendant knowingly publishes an altered or incomplete quote and that altered or incomplete quote is materially different from the actual quote."[5] To this end, Tang offers summary judgment evidence to show that Wang was aware of the entire statement, but chose to publish only part of it. Tang cites evidence showing that Wang personally heard Tang's remarks at the press conference and also viewed a videotape of the statement before the article was published.

In his summary judgment response, Tang asserts,

The fact that Defendant had a video of the conference and had actual knowledge of what Mr. Tang said but nonetheless omitted half of the statement to change the meaning is conclusive evidence that Defendants published the statement with knowledge it was substantially altered or with reckless disre-

---

5. In support of this proposition, Tang cites the United States Supreme Court's opinion in *Masson v. New Yorker Magazine*, 501 U.S. 496, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991). Despite Tang's reliance, *Masson* is factually inapposite to this case. In *Masson*, the subject quote had a portion of the speaker's words deleted mid-quote with no indication of the deletion. *See id.*, 111 S.Ct. at 2437. Such deletion mislead the reader to believe that the last sentence of the quoted passage directly followed the sentence that preceded it, which it did not. *See id.*, 111 S.Ct. at 2437. Such is not the circumstance here.

gard as to whether it was substantially altered.

■■■■■ Contrary to Tang's position, this alone is not sufficient to raise a fact issue regarding actual malice. Rather, a public figure seeking to recover for an omission must show that the publisher selected the material with actual malice. *Huckabee*, 19 S.W.3d at 426. For an omission to be evidence of actual malice, the plaintiff must prove that the publisher knew or strongly suspected that the omission could create a substantially false impression. *Turner*, 38 S.W.3d at 121. The omission may be so glaring and may result in such a gross distortion that, by itself, it constitutes some evidence of actual malice. *Huckabee*, 19 S.W.3d at 426. "In such a case, the omission so changes the character of the story that one could infer that the defendant knew, or at least suspected, that the omission would convey a false impression." *Id.* Here, the overall purpose of the *Houston Chinese Press* article was to report what transpired at the press conference. According to the article, the CCC board inadequately answered inquiries regarding the CCC's finances, leaving many questions unanswered. The article focused on the contentiousness of the press conference and the perceived hostility toward those who questioned the board. It was in this context that the *Houston Chinese Press* quoted Tang regarding his analogy to the Japanese invasion of China.

Although the *Houston Chinese Press* did not publish the entirety of Tang's closing remarks, Tang has not offered summary judgment evidence to show that the *Houston Chinese Press* knew or strongly suspected that failing to include the last portion of his statement could create a substantially false impression. As discussed, Wang testified in his affidavit that he believed, in the context of the contentious press conference, that Tang was re-

ferring to those in the Chinese community questioning the CCC board as "Japanese enemies." This, to Wang, was the "noteworthy" or newsworthy comment made by Tang. It follows that this was the portion of Tang's remarks that the *Houston Chinese Press* choose to publish. We do not agree with Tang's assertion that the omitted portion of his statement "specifically rebut[s] the defamatory charge that [the] article imputed to [Tang]." Rather, this is but one interpretation depending on the listener's point of view.

■■■ In the absence of evidence that it omitted Tang's remarks to portray his statements falsely, the First Amendment protects the *Houston Chinese Press's* editorial choice regarding what material it included in the article. *See id.* Tang offered no evidence to controvert Wang's testimony regarding his interpretation of Tang's remarks. Nor has Tang offered sufficient evidence to show that Wang's interpretation was not a plausible or reasonable one in light of the tenor of the press conference and the provocative nature of Tang's analogy. *See Cantu*, 168 S.W.3d at 855 (holding that understandable misinterpretation of ambiguous facts does not show actual malice).

■■■ Given Wang's understanding of Tang's comments, the fact that the *Houston Chinese Press* did not publish all of Tang's closing remarks does not itself raise a material fact issue regarding actual malice. *See Huckabee*, 19 S.W.3d at 425 (concluding that evidence showing publication is produced from particular point of view, even if hard-hitting or sensationalistic, is not evidence of actual malice). At most, the *Houston Chinese Press's* decision to include only the first part of Tang's statement was an error in judgment arising from Wang's interpretation of Tang's comments. Errors in judgment are not evidence of actual malice. *See Time Inc.*

*v. Pape,* 401 U.S. 279, 290, 91 S.Ct. 633, 639, 28 L.Ed.2d 45 (1971) (rejecting plaintiff's claim that defendant's interpretation that omitted word "alleged" was evidence of actual malice, although such interpretation was a misconception); *Huckabee,* 19 S.W.3d at 426 (concluding that, even though omitted facts may have allowed reasonable viewer to reach opposite conclusion from what was reported, media defendant's failure to capture accurately all details suggests error in judgment, which is no evidence of actual malice).

We conclude that Tang has not shown that the *Houston Chinese Press's* decision not to publish his entire closing remarks raises an issue of material fact regarding actual malice.

### 2. *Expert Witness Testimony*

■ To raise an issue of material fact regarding actual malice, Tang submitted the "expert affidavit" of John Robbins, "an editor for the largest Chinese press in Houston," who offered his opinion regarding the article. Before forming his opinion, Robbins watched a video of the press conference and read the subject *Houston Chinese Press* article. In his affidavit, Robbins opined that "[t]o publish and refer to only half of the actual quote as the entire quote, and then editorialize from that 'half quote' is not responsible journalism...." Robbins averred that "the only reason for publishing only a select portion of Mr. Tang's statement appears to have been to intentionally misrepresent what Mr. Tang actually said, and then to proceed with the publishing of an article based on that misrepresentation."

■ Contrary to Tang's assertion, Robbins's testimony is not probative of actual malice. "An expert's testimony 'is

not probative of actual malice because [his] opinion relates to a reckless disregard for a standard of objectivity, not for the truth.'" *Gonzales v. Hearst Corp.,* 930 S.W.2d 275, 283 (Tex.App.-Houston [14th Dist.] 1996, no writ) (quoting *Harris v. Quadracci,* 856 F.Supp. 513, 519 (E.D.Wis. 1994)). Moreover, actual malice inquires only into the mental state of the defendant, and Robbins claimed no expertise in that field. *See Cantu,* 168 S.W.3d at 858–59. Robbins's opinion was not based on evidence that gave particular insight into the defendants' mental state; rather, his opinion was based on his reading of the article and on his viewing of the videotape of the press conference. *See id.* at 859. Assuming the "expert affidavit" was competent evidence, Robbins's opinion does not raise a genuine issue of material fact with regard to whether the *Houston Chinese Press* published the alleged defamatory statements with knowledge that they were false or with reckless disregard of whether they were true or false. *See id.*

### Conclusion

The summary judgment record establishes, as a matter of law, that the *Houston Chinese Press* did not publish the alleged defamatory remarks with actual malice. Tang has not carried his summary judgment burden to show that a genuine issue of material fact exists with regard to the actual malice element. We hold that the *Houston Chinese Press* is entitled to summary judgment.

We sustain the *Houston Chinese Press's* first issue,[6] reverse the trial court's order to the extent that it denies the *Houston Chinese Press's* motion for summary judg-

---

**6.** Because the first issue is dispositive of the appeal, we do not address the *Houston Chi-* *nese Press's* two remaining issues.

ment, and render judgment that Tang take nothing.