ACCEPTED
03-14-00749-CV
4128672
THIRD COURT OF APPEALS
AUSTIN, TEXAS
2/12/2015 2:17:16 PM
JEFFREY D. KYLE
CLERK

No. 03-14-00749-CV

# In the Court of Appeals for the Third Judicial District, Austin

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
2/12/2015 2:17:16 PM
JEFFREY D. KYLE
Clerk

THE UNIVERSITY OF TEXAS AT AUSTIN,
*Appellant*,

v.

WILLIAM A. BELLINGHAUSEN, JR.,
*Appellee.*

On Appeal from the 345th Judicial District Court of Travis County

## APPELLANT'S BRIEF

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1729
Fax: (512) 474-2697

SCOTT A. KELLER
Solicitor General

JOSEPH D. HUGHES
Assistant Solicitor General
State Bar No. 24007410
*jody.hughes@texasattorneygeneral.gov*

JASON WARNER
Assistant Attorney General

COUNSEL FOR APPELLANT

## ORAL ARGUMENT REQUESTED

## IDENTITY OF PARTIES AND COUNSEL

***Appellant***: The University of Texas at Austin ("UT-Austin" or "the University")

***Counsel for Appellant***:

Lead Appellate Counsel
  Joseph D. Hughes
  State Bar No. 24007410
  Assistant Solicitor General
  OFFICE OF THE ATTORNEY GENERAL
  P.O. Box 12548 (MC 059)
  Austin, Texas 78711-2548
  Tel.: (512) 936-1729
  Fax: (512) 474-2697
  *jody.hughes@texasattorneygeneral.gov*

Trial and Additional Appellate Counsel
  Jason Warner
  State Bar No. 24028112
  Assistant Attorney General
  OFFICE OF THE ATTORNEY GENERAL
  P.O. Box 12548 (MC 017)
  Austin, Texas 78711-2548
  Tel.: (512) 463-2197
  Fax: (512) 477-2348
  *jason.warner@texasattorneygeneral.gov*

***Appellee***:  William A. Bellinghausen, Jr.

***Counsel for Appellee***
  Robert Ranco
  State Bar No. 24029785
  The Carlson Law Firm, P.C.
  11606 N. IH-35
  Austin, Texas 78753
  Tel.: (512) 346-5688
  Fax: (512) 719-4362
  *rranco@carlsonattorneys.com*

# TABLE OF CONTENTS

Identity of Parties and Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Index of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

Statement Regarding Oral Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

Issue Presented . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    I.   Plaintiff's Accident . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    II.  The Sidewalks on the University Campus . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    III. David Henry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    IV. The Police Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Summary of the Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    I.   Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    II.  There Is No Evidence That UT-Austin Knew That an Unreasonably Dangerous Condition Existed at the Place and Time Bellinghausen Fell . . . 12

        A.     Sovereign Immunity Is Not Waived for Premises-Defect Claims Unless the Plaintiff Can Prove Actual Knowledge of an Unreasonably Dangerous Condition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        B.     Prior to Bellinghausen's Accident, UT-Austin Received No Complaints About, or Reports of Accidents or Injuries Caused by, the Sidewalk on Which Bellinghausen Tripped . . . . . . . . . . . . . . . . . . . . . 14

C.    Knowledge That Uneven Sidewalks Exist on Campus Is Not Sufficient To Show Actual Knowledge of an Unreasonably Dangerous Condition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

D.    Officer Gonzalez's Report Does Not Create a Fact Issue as to Whether UT-Austin Had Actual Knowledge of an Unreasonably Dangerous Condition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

       1.    Henry could not have perceived the expansion joint as unreasonably dangerous from 150 feet away . . . . . . . . . . . . . . 19

       2.    Officer Gonzalez used the phrase "same protruding crack" to memorialize Henry's observation that the inattentive pedestrian had fallen where Bellinghausen later fell . . . . . . . . . 20

       3.    The bare fact that an inattentive pedestrian has fallen does not imply an unreasonably dangerous sidewalk . . . . . . . . . . . . 22

       4.    No reasonable juror could believe that Henry knew that the sidewalk was unreasonably dangerous but Bellinghausen did not . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

       5.    Henry's clarification regarding what he told Officer Gonzalez does not create a fact question about what he knew . . . . . . . . 27

Prayer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Certificate of Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

# INDEX OF AUTHORITIES

## Cases

*Am. Indus. Life Ins. Co. v. Ruvalcaba*,
64 S.W.3d 126 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) . . . . . . . . . . 24

*Baker v. City of Granite City*,
394 N.E.2d 33 (Ill. App. Ct. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Brinson Ford, Inc. v. Alger*,
228 S.W.3d 161 (Tex. 2007) (per curiam) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 25

*Browning-Ferris, Inc. v. Reyna*,
865 S.W.2d 925 (Tex. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*City of Austin v. Leggett*,
257 S.W.3d 456 (Tex. App.—Austin 2008, pet. denied) . . . . . . . . . . . . . . . . . 13, 16

*City of Corsicana v. Stewart*,
249 S.W.3d 412 (Tex. 2008) (per curiam) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 16

*City of Dallas v. Thompson*,
210 S.W.3d 601 (Tex. 2006) (per curiam) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*City of Keller v. Wilson*,
168 S.W.3d 802 (Tex. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Girdler v. United States*,
923 F. Supp. 2d 168 (D.D.C. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Gonzales v. Hearst Corp.*,
930 S.W.2d 275 (Tex. App.—Houston [14th Dist.] 1996, no writ) . . . . . . . . . . . 26

*Hammerly Oaks, Inc. v. Edwards*,
958 S.W.2d 387 (Tex. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Heflin v. Am. Home Wildwood Estates, L.P.*,
936 So.2d 226 (La. App. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*In re E.N.C.,*
　　384 S.W.3d 796 (Tex. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*King Ranch, Inc. v. Chapman,*
　　118 S.W.3d 742 (Tex. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Mangham v. YMCA of Austin,*
　　408 S.W.3d 923 (Tex. App.—Austin 2013, no pet.) . . . . . . . . . . . . . . . . . . . . 12

*Marathon Corp. v. Pitzner,*
　　106 S.W.3d 724 (Tex. 2003) (per curiam) . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Matthews v. Vlad Restoration Ltd.,*
　　904 N.Y.S.2d 391 (N.Y. App. Div. 2010) . . . . . . . . . . . . . . . . . . . . . . . . 22-23

*Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.,*
　　896 S.W.2d 156 (Tex. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Putman v. Vill. of Bensenville,*
　　786 N.E.2d 203 (Ill. App. Ct. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Reed v. Wal-Mart Stores, Inc.,*
　　708 So. 2d 362 (La. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Reyes v. City of Laredo,*
　　335 S.W.3d 605 (Tex. 2010) (per curiam) . . . . . . . . . . . . . . . . . . . . . . . . 15-17

*Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.,*
　　435 S.W.2d 854 (Tex. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 26

*Seideneck v. Cal Bayreuther Assocs.,*
　　451 S.W.2d 752 (Tex. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*State v. Gonzalez,*
　　82 S.W.3d 322 (Tex. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 23

*Tex. Dep't of Parks & Wildlife v. Miranda,*
　　133 S.W.3d 217 (Tex. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 14

*Univ. of Tex. at Austin v. Hayes,*
  327 S.W.3d 113 (Tex. 2010) (per curiam)  . . . . . . . . . . . . . . . . . . . . . . . . .  13, 23, 24

*Univ. of Tex. at Austin v. Sampson,*
  No. 03-12-00265-CV, 2014 WL 3893085
  (Tex. App.—Austin Aug. 8, 2014, pet. filed) (mem. op.)  . . . . . . . . . . . . . . .  14, 23

*Univ. of Tex. at El Paso v. Muro,*
  341 S.W.3d 1 (Tex. App.—El Paso 2009, no pet.)  . . . . . . . . . . . . . . . . . . . . .  23, 24

*Univ. of Tex.-Pan Am. v. Aguilar,*
  251 S.W.3d 511 (Tex. 2008) (per curiam)  . . . . . . . . . . . . . . . . . . . . . . . . . . .  14, 23

*Wal-Mart Stores, Inc. v. Miller,*
  102 S.W.3d 706 (Tex. 2003) (per curiam)  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

## Constitutional Provisions, Statutes, and Rules

TEX. CIV. PRAC. & REM. CODE § 101.021(2)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

TEX. CIV. PRAC. & REM. CODE § 101.022(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

## STATEMENT OF THE CASE

*Nature of the Case*:   This is a premises-defect case in which the plaintiff alleges that he was injured when he tripped on a sidewalk on the UT-Austin campus.

*Trial Court*:   The Hon. Stephen Yelenosky, Presiding Judge of the 345th District Court, Travis County

*Course of Proceedings*:   The University included a plea to the jurisdiction as part of its amended answer, filed October 31, 2014. CR.47-51.[1] UT-Austin filed a brief in support of its plea on November 7, 2014, CR.51-200, along with supplemental evidence, CR.201-18. The plaintiff filed a brief in response on November 20, 2014, the same date on which a hearing was held on the plea. CR.219-307.[2]

*Trial Court Disposition*:   The trial court denied the University's jurisdictional plea on November 21, 2014. CR.317; *see* App. A. Judge Yelenosky explained his reasoning in a letter to which the order was attached. CR.314-15. The University timely perfected appeal. CR.318-19.

---

1. Citations of the clerk's record appear in the following format: "CR.[page]." When the cited reference is to deposition testimony, the citation will also include a page-and-line reference to the deposition transcript, in this format: "CR.[record page] ([transcript page]:[line]-[line])."

2. Judge Yelenosky did not allow a court reporter to transcribe the hearing because no live testimony was adduced. For that reason, no reporter's record exists.

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument would assist the Court in applying Texas premises-defect law to the unusual factual circumstances of this case. Several hours before Bellinghausen tripped and fell on a sidewalk on the UT-Austin campus, from at least 150 feet away, a university employee had witnessed an inattentive pedestrian fall in the same location. Oral argument would help the Court understand why no juror could reasonably find that, from that distance, seeing an inattentive pedestrian fall gave the employee actual knowledge of an unreasonably dangerous condition.

## ISSUE PRESENTED

Is there more than a scintilla of evidence that, before Bellinghausen's accident, UT-Austin had actual knowledge of an unreasonably dangerous condition on the sidewalk where Bellinghausen tripped?

No. 03-14-00749-CV

# In the Court of Appeals for the
# Third Judicial District, Austin

THE UNIVERSITY OF TEXAS AT AUSTIN,
*Appellant*,

v.

WILLIAM A. BELLINGHAUSEN, JR.,
*Appellee*.

On Appeal from the 345th Judicial District Court of Travis County

## APPELLANT'S BRIEF

TO THE HONORABLE THIRD COURT OF APPEALS:

An inattentive pedestrian can trip on any sidewalk. Even when two adjacent sidewalk slabs are perfectly level (and often they are not), one's toe or heel can drop into the gap between the slabs and catch on the facing slab edge. An untied shoelace, a loose pant cuff, a textured surface, a curb, or debris, among other things, can also trip the unwary. Thus, the mere fact that an inattentive pedestrian has fallen does not imply that the sidewalk beneath him is defective, much less unreasonably dangerous.

In denying the University's jurisdictional plea, the trial court relied on a report that, a few hours before Bellinghausen fell, a maintenance supervisor had witnessed an

inattentive pedestrian trip in the same area. The court held that the report created a fact question as to whether the supervisor knew that the sidewalk where Bellinghausen tripped was unreasonably dangerous. But reaching that conclusion requires several unreasonable inferences, because it is undisputed that the supervisor was at least 150 feet away and the pedestrian appeared to be texting or dialing his mobile phone when he fell. Because inattentive pedestrians can fall for many reasons, merely witnessing an inattentive pedestrian fall from a distance too great to perceive *why* he fell provides no notice of an unreasonably dangerous condition. And no fact-finder could reasonably conclude that the supervisor perceived a defective sidewalk from that distance.

The notation in the police report stating that the maintenance supervisor "said that he saw another person trip and fall on the same protruding crack at about 9:00 am" does not create a material fact dispute. The report is consistent with the supervisor's deposition testimony and the other evidence, all of which reflects that he saw an inattentive pedestrian trip around 9:00 a.m. but did not perceive any problem with the sidewalk until around noon, when, after Bellinghausen fell in the same vicinity, the supervisor approached the accident site and saw the uneven sidewalk on which both men presumably tripped. No reasonable fact-finder could interpret the police report as evidence that the maintenance supervisor actually identified the sidewalk as unreasonably dangerous earlier that morning, based solely on witnessing the inattentive pedestrian fall. Accordingly, Bellinghausen's claims should be dismissed for lack of jurisdiction.

2

Plaintiff William Bellinghausen, Jr. is a resident of Bastrop and an advisor for a Bastrop chapter of the Boy Scouts. At the time of the accident, he was 68 years old.

## I.  PLAINTIFF'S ACCIDENT

On Saturday, August 27, 2011, Bellinghausen drove to the UT-Austin campus to attend a Native American "powwow" event at the Recreational Sports Center ("RSC"), which is located on the southeastern part of campus, on the north side of East 20th Street west of Robert Dedman Drive. CR.83-84 (88:22-89:16). He paid for parking but did not pay to use the campus, and there was no fee to attend the powwow. CR.84 (90:21-91:3, 92:1-2). Around noon, as he was walking along the sidewalk on the southeast corner of the RSC, he tripped and fell. CR.85 (95:25-96:5). He had not been looking down when he tripped, CR.86 (99:11-12), but afterwards he saw that the raised edge of a slab had made a section of the sidewalk uneven, CR.85 (96:13-15).

Some parking attendants saw that Bellinghausen was injured, and UT-Austin Police Officer Roberto Gonzalez was dispatched to the scene. Officer Gonzalez found Bellinghausen sitting next to the sidewalk, bleeding from the head and complaining of pain in his shoulder and ribs. CR.100. An EMS unit arrived and began treating his injuries. *Id.* Bellinghausen told the officer that he had tripped on a sidewalk crack and asked that a photo of the crack be taken. *Id.* Bellinghausen was transported to the hospital, where it was determined that he sustained a broken arm and other injuries.

Attached as Appendices B-D are several photographs of the scene. The first, taken by Officer Gonzalez looking southwest, shows the sidewalk where Bellinghausen tripped in the foreground and the Skilled Social Work building in the background, across East 20th Street. App. B; CR.91. The second photo, which was taken by a bystander, shows Bellinghausen lying beside the sidewalk receiving treatment; an uneven section of sidewalk appears in the foreground of the photo. App. C; CR.93. The third is a close-up photo of the uneven sidewalk taken by Officer Gonzalez. App. D; CR.95.

## II.  THE SIDEWALKS ON THE UNIVERSITY CAMPUS

Carl Julius "C.J." Wiles has been UT-Austin's Associate Director of Construction Services since 2006. CR.134(16:13-16). He is in the Department of Project Management and Construction Services, which is responsible for pavement and sidewalks. CR.135 (19:12-17). Many University campus sidewalks, including those around the RSC, consist of a series of adjoining concete slabs, surfaced with stone and separated by expansion joints. CR.251 (25:13-19).[3] Tree roots, soil composition, irrigation, and other factors can cause the edge of one sidewalk slab to rise above or sink below the level of the adjoining slab. CR.139-40 (37:14-38:3). As a result, there are uneven sections of sidewalks on many parts of campus. CR.139 (35:18-36:4).

---

3. An expansion joint is a gap between adjacent sidewalk slabs that is designed to accommodate movement of the slabs and prevent them from breaking. CR.149 (99:6-22).

4

Sang Ho Lee has been the project manager for UT-Austin's Project Management and Constructive Services Department since 2007. CR.205, ¶ 2. Lee testified that UT-Austin had a consultant conduct an analysis of its campus sidewalks in 2008. CR.206, ¶ 3; CR.164-90. The analysis rated each sidewalk area based on its condition and expected remaining service life: Unsatisfactory (0-2 years); Poor (3-6 years); Fair (7-12 years); Good (13-20 years); and New (20-25 years). CR.206, ¶ 3. The sidewalk where Bellinghausen tripped was marked as being in Good condition. *Id.* at ¶ 4; CR.146-47 (69:16-70:9). Lee did not consider it dangerous or in need of repair. CR.206-07, ¶ 4.

Roxanne Hall has been the Records Administrator for the UT-Austin Police Department since 2001. CR.97, ¶ 2. After Bellinghausen's accident, Hall searched the department records for reports of any accidents involving the sidewalks around the RSC. *Id.* at ¶ 3. The only one she found was the report about Bellinghausen's fall. *Id.* at ¶ 4.

Margo Iwanski has been the Assistant to the Vice President, CFO, and Custodian of Records for UT-Austin since 1997. CR.198, ¶ 2. She reviewed the files and records maintained by her office and found no record or report of a trip-and-fall accident, injury, or other incident involving the sidewalk on the southeast corner of the RSC, other than the police report concerning Bellinghausen's fall on August 27, 2011. *Id.* at ¶ 3. She also found no complaints or reports of any flaws or defects with the sidewalks on the southeast corner of the RSC before or after August 27, 2011. *Id.*

## III. DAVID HENRY

David Henry is a maintenance supervisor for UT-Austin. CR.112 (9:18-21). He has worked for the University since 1997. CR.113 (11:7-9). On the morning of August 27, 2011, he was cleaning air-conditioning units on the east side of the Skilled Social Work building, which is located across East 20th Street from, and to the south of, the RSC. CR.114 (19:1-8). Henry and his crew were working approximately 150 to 200 feet away from the sidewalk area where Bellinghausen tripped. CR.115 (23:2-6). One of the crew members saw Bellinghausen lying on the ground and alerted Henry, who walked over to investigate. *Id.* (22:18-23:1). When Henry arrived, several bystanders were already assisting Bellinghausen. CR.263 (37:9-11).[4] Based on the location where Bellinghausen was resting, Henry concluded that he had likely tripped over an expansion joint between two sidewalk slabs. CR.116 (26:3-11); CR.118 (38:17-39:13).

Earlier on the morning of August 27, around 9:00 a.m., Henry had observed an unidentified man fall on the sidewalk in the vicinity of where Bellinghausen would fall a few hours later. CR.116 (26:12-25, 29:9-25). The man fell onto his hands and knees but quickly got up and continued walking. *Id.* (27:22-28:4); CR.119 (64:11-16). He had been looking at his mobile phone, apparently texting or checking his voicemail, just

---

4. Most references to Henry's deposition testimony cite the condensed transcript that was attached as Exhibit D to the University's brief in support of its jurisdictional plea. CR.110-24. Pages 34-37, 42-61, and 70-73 of that version were not included in the clerk's record. Accordingly, references to Henry's testimony that appears on those missing pages cite the complete, uncondensed transcript that Bellinghausen attached as Exhibit A to his response to the University's plea. CR.227-305.

before he fell. CR.116 (26:20-22). Henry did not see the man's foot catch on a raised sidewalk edge; he simply saw the man fall. *Id.* (27:7-13). Henry was 150 to 200 feet away, working on the east side of the Skilled Social Work building. CR.115 (23:2-6).

Henry did not report the fall or take other action because the pedestrian walked away, apparently uninjured, and Henry attributed the fall to the man's attention having been fixed on his cell phone instead of where he was walking. CR.119-20 (64:19-65:17, 66:10-17). At the time, Henry did not think that the sidewalk was responsible for causing the man's fall, CR.119 (65:10-17), so he did not walk over to inspect the sidewalk, CR.117 (30:5-7). It was not until after Bellinghausen fell that Henry walked over and saw the expansion joint shown in Appendix D. CR.118 (38:17-39:13). As Henry later acknowledged, the adjoining slab edges were not level with one another on the right-hand side of the expansion joint. App. D; CR.116 (26:3-11).

Henry did not talk to Bellinghausen, CR.118 (38:3-6), but he did speak with Officer Gonzalez. He told the officer that he had been working nearby all morning and that around 9:00 a.m., he had seen a white male fall onto all fours in the same area where Bellinghausen fell. CR.119 (63:15-20). Specifically, Henry told Officer Gonzalez that he had seen the pedestrian fall "right there." CR.120 (67:3-8). Henry said that he would submit a request to have the sidewalk leveled, and then he went back to work. CR.118 (40:11-25). He submitted the request the following Monday. *Id.* (40:16-18).

## IV. THE POLICE REPORT

Officer Gonzalez wrote a report summarizing his observations of the accident scene. CR.100; App. E. The report states, among other things, that:

- "Bellinghausen said he was walking on the sidewalk when he tripped over a protruding crack in the sidewalk."

- "Bellinghausen requested that photos of the crack be taken with his digital camera"; and

- "A Facilities staff member, David Henry, was working nearby all morning and said that he saw another person trip and fall on the same protruding crack at about 9:00 am. The subject appeared to be a white male in his mid 30's. Henry said the subject fell forward and ended up on all fours."

*Id.*

To be clear, Henry did not say that he saw the same crack (or expansion joint, to be more accurate) cause either fall. *Id.*; CR.119 (63:23-64:1). Instead, in the audio portion of the video recording taken from Officer Gonzalez's squad car, Henry can be heard telling the officer that the unidentified pedestrian, who was not paying attention to where he was walking, had fallen "right there." CR.276 (50:15-25).[5] By that, Henry meant that both falls happened in the same vicinity, not necessarily in the same exact

5. The police video recording is not part of the appellate record, but Plaintiff's counsel reviewed it with Henry at his deposition, and together they were able to identify the portions in which Henry made audible statements. CR.272-83 (46:10-57:5). At one point, Henry can be heard telling Officer Gonzalez that he saw a male in his 30s or 40s fall on all fours and arise unhurt earlier that day, around 9 a.m. CR.279 (53:3-18). Henry later can be heard saying that he took a picture of the sidewalk and would submit it to UT-Austin along with a request to have the sidewalk repaired. CR.280 (54:16-25). Neither Henry, Officer Gonzalez, nor anyone else whose voice is audible can be seen on camera.

spot. CR.120 (67:3-16, 68:3-15). Nevertheless, because Henry had said "right there," instead of specifying that the inattentive pedestrian had fallen in the same general vicinity, he could understand why Officer Gonzalez wrote that Henry had reported seeing "another person trip and fall on the same protruding crack." *Id.* (67:1-68:2).

## SUMMARY OF THE ARGUMENT

Constructive knowledge cannot waive a governmental defendant's immunity for a premises defect. Instead, the plaintiff must show that the defendant had actual knowledge of an unreasonably dangerous condition. In this case, the trial court should have dismissed Bellinghausen's claims because UT-Austin established that it had no notice of an unreasonably dangerous condition, and there is no evidence on which a reasonable fact-finder could rely to conclude otherwise.

The trial court held that actual knowledge could be inferred from maintenance supervisor David Henry's observation of an inattentive pedestrian's fall, in the same vicinity, a few hours before Bellinghausen's fall. Specifically, the court relied on Officer Gonzalez's notation in his police report that Henry had seen the inattentive pedestrian trip "on the same protruding crack" as evidence that Henry actually perceived, upon witnessing that initial incident, that the sidewalk crack in question was unreasonably dangerous. But the trial court's theory rests on a series of unreasonable inferences that, whether taken together or separately, cannot create a fact issue about whether Henry had actual knowledge of an unreasonably dangerous condition before Bellinghausen fell.

9

The evidence demonstrates that Henry identified the uneven expansion joint as a tripping hazard only *after* Bellinghausen fell. It is undisputed that Henry was working at least 150 feet away when he saw the inattentive pedestrian fall. No reasonable fact-finder could conclude that Henry was able to identify individual expansion joints at that distance, much less perceive one as unreasonably dangerous. Nor is it reasonable to infer that a sidewalk is unreasonably dangerous simply because an inattentive pedestrian has fallen, because an unwary pedestrian can fall on any sidewalk—even a level one.

No other evidence indicates that UT-Austin had prior knowledge of an unreasonably dangerous condition. UT-Austin provided unrebutted testimony that, prior to Bellinghausen's fall, it received no reports of sidewalk defects or slip-and-fall injuries involving the sidewalk area southeast of the RSC. And a 2008 report commissioned by the University had designated the sidewalk in that area as being in good condition, with an expected remaining service life of 13-20 years.

Absent actual knowledge that the crack that tripped Bellinghausen was an unreasonably dangerous condition, UT-Austin cannot be sued. In this case, the evidence did not create a material fact issue about whether the University had prior knowledge. Accordingly, the trial court should have granted the University's jurisdictional plea and dismissed Bellinghausen's claims.

## ARGUMENT

## I.    STANDARD OF REVIEW

In reviewing an order denying a jurisdictional plea, whether the plaintiff has alleged facts that affirmatively demonstrate subject-matter jurisdiction is a legal question reviewed de novo. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). The plaintiff has the initial burden of alleging facts that demonstrate the trial court's jurisdiction. *Id.* If a plea to the jurisdiction challenges the existence of jurisdictional facts, the trial court must consider evidence as necessary to resolve the jurisdictional issues. *Id.* at 227. When evidence is submitted that implicates the merits of the case, the standard of review generally mirrors the standard governing a motion for traditional summary judgment under Texas Rule of Civil Procedure 166a(c). *Id.* at 228.

Under that standard, the burden is on the governmental defendant to assert that the court lacks jurisdiction and present evidence supporting its plea. *Id.* If the defendant satisfies its burden, the burden shifts to the plaintiff to show a material fact dispute regarding a jurisdictional issue. *Id.* In determining whether a material fact dispute exists, the reviewing court takes as true all evidence that is favorable to the plaintiff and indulges every reasonable inference in the plaintiff's favor. *Id.* In order to show that some evidence exists that would support a finding in his favor, the plaintiff must establish that more than a mere scintilla of evidence contradicts the defendant's evidence. *See City of Keller v. Wilson*, 168 S.W.3d 802, 813 (Tex. 2005).

11

"More than a scintilla of evidence means evidence 'ris[ing] to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Mangham v. YMCA of Austin*, 408 S.W.3d 923, 927 (Tex. App.—Austin 2013, no pet.) (quoting *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003)). Thus, a court may not credit evidence that a reasonable fact-finder would not. *Id.*; *City of Keller*, 168 S.W.3d at 827-28. Nor can a fact dispute be created by making unreasonable inferences from the evidence, or by piling one inference upon another. *In re E.N.C.*, 384 S.W.3d 796, 804 (Tex. 2012) (citing *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 392 (Tex. 1997); *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 858 (Tex. 1968)).

## II. THERE IS NO EVIDENCE THAT UT-AUSTIN KNEW THAT AN UNREASONABLY DANGEROUS CONDITION EXISTED AT THE PLACE AND TIME BELLINGHAUSEN FELL.

### A. Sovereign Immunity Is Not Waived for Premises-Defect Claims Unless the Plaintiff Can Prove Actual Knowledge of an Unreasonably Dangerous Condition.

The Texas Tort Claims Act waives sovereign immunity for claims of injury "caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." TEX. CIV. PRAC. & REM. CODE § 101.021(2). If the claim arises from a premises defect and the plaintiff did not pay to use the premises, the landowner owes the claimant "only the duty that a private person owes to a licensee on private property." *Id.* § 101.022(a). A landowner owes a licensee the duty "to either (1) use ordinary care to warn a licensee

12

of a condition that presented an unreasonable risk of harm of which the landowner is actually aware and the licensee is not, or (2) make the condition reasonably safe." *Univ. of Tex. at Austin v. Hayes*, 327 S.W.3d 113, 117 (Tex. 2010) (per curiam).

Bellinghausen testified that he did not pay a fee to use the premises, CR.84 (90:21-91:3), and he concedes that the licensee standard applies, CR.221 (Pl.'s Resp. to Def.'s Jurisdictional Plea at ¶ 3). Accordingly, UT-Austin's immunity is not waived unless, before the accident occurred, it had "actual knowledge of an unreasonably dangerous condition." *City of Austin v. Leggett*, 257 S.W.3d 456, 476 (Tex. App.—Austin 2008, pet. denied). "A condition is unreasonably dangerous if it presents an unreasonable risk of harm." *Brinson Ford, Inc. v. Alger*, 228 S.W.3d 161, 163 (Tex. 2007) (per curiam).

In the absence of direct evidence, a plaintiff can use circumstantial evidence to show a premises owner's actual knowledge of a dangerous condition, but "only when it 'either directly or by reasonable inference' supports that conclusion." *City of Corsicana v. Stewart*, 249 S.W.3d 412, 415 (Tex. 2008) (per curiam) (quoting *State v. Gonzalez*, 82 S.W.3d 322, 330 (Tex. 2002)). Unreasonable inferences cannot create a fact question. *See Schlumberger Well Surveying*, 435 S.W.2d at 858. Nor can a plaintiff create evidence of actual knowledge by stacking inferences. *See id.*; *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 728 (Tex. 2003) (per curiam) ("[A]n inference stacked only on other inferences is not legally sufficient evidence.").

**B.      Prior to Bellinghausen's Accident, UT-Austin Received No Complaints About, or Reports of Accidents or Injuries Caused by, the Sidewalk on Which Bellinghausen Tripped.**

When determining whether a premises owner had actual knowledge of a dangerous condition, "courts generally consider whether the premises owner has received reports of prior injuries or reports of the potential danger represented by the condition." *Univ. of Tex.-Pan Am. v. Aguilar*, 251 S.W.3d 511, 513 (Tex. 2008) (per curiam).  Here, the affidavit testimony of Roxanne Hall, Margo Iwanski, and Sang Ho Lee established that, prior to Bellinghausen's fall, UT-Austin had not received any reports of accidents or injuries occurring on the sidewalks around the RSC.  CR.97-98, 198-99, 205-07.  Moreover, the 2008 survey indicated that the sidewalks in that area were in good condition, with an expected remaining service life of 13 to 20 years.  CR.164-90, 206-07. Accordingly, the University established that it lacked actual knowledge, at the time of the accident, that an unreasonably dangerous condition existed on the sidewalk where Bellinghausen fell.  It then became Bellinghausen's burden to show the existence of a material fact dispute on that issue.  *See Miranda*, 133 S.W.3d at 228; *Univ. of Tex. at Austin v. Sampson*, No. 03-12-00265-CV, 2014 WL 3893085, at *6 (Tex. App.—Austin Aug. 8, 2014, pet. filed) (mem. op.).

**C.** **Knowledge That Uneven Sidewalks Exist on Campus Is Not Sufficient To Show Actual Knowledge of an Unreasonably Dangerous Condition.**

In an effort to show that the University had prior knowledge of a dangerous condition, Bellinghausen pointed to David Henry's deposition testimony acknowledging that uneven sidewalks exist all over campus. CR.221 (Pl.'s Resp. to Def.'s Jurisdictional Plea at ¶ 4); CR.256 (30:8-10). Henry also agreed with Plaintiff's counsel that "this stuff happens with expansion joints"—that is, over time, expansion joints become out of level because of soil movement caused by tree roots and other factors. CR.256 (30:17-24). But Henry's knowledge that campus sidewalks have some uneven sections caused by settling slabs is no evidence that UT-Austin had actual knowledge that the particular sidewalk where Bellinghausen tripped was unreasonably dangerous at the time of his accident. *See Reyes v. City of Laredo*, 335 S.W.3d 605, 608-09 (Tex. 2010) (per curiam); *City of Dallas v. Thompson*, 210 S.W.3d 601, 603 (Tex. 2006) (per curiam).

In *Thompson*, the plaintiff tripped on the lip of an improperly secured expansion-joint coverplate protruding from the floor of a Dallas airport lobby. 210 S.W.3d at 602. City employees knew that the coverplate periodically became loose, and whenever it did they would tighten it. *Id.* at 603. Shortly before Thompson's fall, city employees "had been in the area of the coverplate and probably had walked over it." *Id.* But the Supreme Court rejected Thompson's argument that the city's knowledge of the periodic protrusion and the need for inspection and maintenance satisfied the actual-knowledge

15

requirement, noting: "[T]he fact that materials deteriorate over time and may become dangerous does not itself create a dangerous condition, and the actual knowledge required for liability is of the dangerous condition at the time of the accident, not merely of the possibility that a dangerous condition can develop over time." *Id.* Because there was no evidence that the city actually knew that the coverplate was protruding at the time of the accident, the Court affirmed the dismissal of Thompson's suit. *Id.* at 604.

Similarly, in *Reyes*, the Supreme Court held that city employees' knowledge that a low-water crossing tended to flood during heavy rains, combined with a 911 caller's warning several hours before the accident that the waters of a nearby creek were rising and would sweep away cars if left unchecked, was no evidence that the city knew that a dangerous condition existed at that low-water crossing at the time of the accident. 335 S.W.3d at 608-09; *see also City of Corsicana*, 249 S.W.3d at 414-16 (city employees' knowledge that a low-water crossing tended to flood during heavy rains, combined with evidence that it was raining hard on the night of the accident and a road upstream from the crossing was closed due to flooding, was insufficient to support an inference that the city knew an unreasonably dangerous condition existed when and where the accident occurred); *Leggett*, 257 S.W.3d at 476 (evidence that an outflow grate on a stormwater retention pond had previously clogged would not support inferences that the city actually knew, at the time of the accident, that the grate was clogged or that a dangerous condition existed at the intersection where the accident occurred).

16

Not every sidewalk is perfectly level. Anyone who has spent much time on the University campus—or walked on any sidewalk, for that matter—understands that slabs can move and settle over time. But "[a]wareness of a potential problem is not actual knowledge of an existing danger." *Reyes*, 335 S.W.3d at 609. Accordingly, Henry's acknowledgment that campus sidewalks tend to become out of level is no evidence that the University had actual knowledge of an unreasonably dangerous condition.

**D.** **Officer Gonzalez's Report Does Not Create a Fact Issue as to Whether UT-Austin Had Actual Knowledge of an Unreasonably Dangerous Condition.**

The trial court treated Henry's observation of a pedestrian who fell while looking at his mobile phone as the functional equivalent of UT-Austin receiving a report of a dangerously defective sidewalk. Specifically, the court relied on the notation in Officer Gonzalez's report that Henry had reported that an unidentified man had tripped "on the same protruding crack" as evidence that Henry knew, before Bellinghausen fell, that the sidewalk was unreasonably dangerous. CR.100. The court reasoned:

> There is evidence that the University had actual knowledge of the hazard. It is rare to have one person witness two people fall in any proximity to one another. Even rarer to have the witness' recorded statement at the scene. Corrections, qualifications, or clarifications cannot undo the factual question. Credibility becomes the issue.

CR.315. That reasoning is flawed in several significant respects.

As an initial matter, contrary to the trial court's suggestion, it is undisputed that Henry did *not* witness Bellinghausen's fall. CR.115 (22.10-15). Instead, Henry went over

17

to investigate after one of his crew members saw Bellinghausen lying on the ground and alerted Henry. *Id.* (22:18-23:1). It was only then that Henry saw the expansion joint up close and identified it as the likely cause of Bellinghausen's fall. CR.116 (26:3-11).

Moreover, the trial court's analysis conspicuously fails to identify the "factual question" that the court believed exists. As discussed below, it is undisputed that Henry told Officer Gonzalez that the inattentive pedestrian had earlier fallen "right there." CR.120 (67:3-8). Those words, particularly as they appear in the cold record, do not reveal how large or small a section of sidewalk Henry was indicating to Officer Gonzalez as he spoke them, but it is clear that Henry was referring to the sidewalk in the area where Bellinghausen tripped. It is understandable why Officer Gonzalez, after hearing Bellinghausen's explanation that he "tripped over a protruding crack in the sidewalk" followed by Henry's statement that the inattentive pedestrian had tripped "right there," surmised that both men had tripped on "the same protruding crack." CR.100. And regardless of exactly what Officer Gonzalez thought Henry meant by "right there," no reasonable fact-finder could determine that Henry, who was at least 150 feet away when he saw the inattentive pedestrian fall, actually perceived the expansion joint as unreasonably dangerous from that distance.

### 1. Henry could not have perceived the expansion joint as unreasonably dangerous from 150 feet away.

A fact-finder would have to make a series of unreasonable inferences to conclude that Henry recognized, *at the time the inattentive pedestrian fell*, that what caused him to fall was "the same protruding crack" on which Bellinghausen later tripped. It is undisputed that Henry was working at least 150 feet away from the area where Bellinghausen fell. CR.115 (23:2-4); CR.117 (30:2-4); CR.120 (69:18-21). From Henry's location across the street, it appeared to him that Bellinghausen fell "in the same vicinity" where the inattentive pedestrian had earlier fallen—that is, within five feet in either direction. CR.116 (29:9-25). Henry did not see what caused the inattentive pedestrian to fall. *Id.* (27:5-13). Later, when Henry went over to assist Bellinghausen after his fall, he observed the uneven sidewalk and surmised that Bellinghausen had tripped over the raised edge. CR.118.(39:2-13; 41:2-6). As discussed below, Henry did not tell Officer Gonzalez that both men tripped over the same expansion joint. But even if he had, the fact that Henry "connected the dots" *after* Bellinghausen fell would not establish that Henry *initially* knew that a particular expansion joint was to blame for the inattentive pedestrian's fall.

Indeed, it would have been impossible for Henry to have done so from a distance of 150 to 200 feet. That would be the equivalent of a referee being able to discern, while standing in the end zone of a football field with unmarked yardage lines, whether a player was tackled at the visitor's or the home team's 49-yard line. Even that comparison

19

is overly generous to Bellinghausen because, unlike a referee trained to observe such details, Henry was "busy working" shortly before the pedestrian tripped and "wasn't really . . . watching that corner." CR.116 (28:23-24). No reasonable trier of fact could believe that Henry, who happened to glance up from his work and observe the fall from at least 150 feet away, actually perceived an uneven expansion joint at that distance and identified it as the cause of the pedestrian's fall.

### 2. Officer Gonzalez used the phrase "same protruding crack" to memorialize Henry's observation that the inattentive pedestrian had fallen where Bellinghausen later fell.

The trial court believed that Officer Gonzalez's notation about Henry having seen the inattentive pedestrian trip on "the same protruding crack" created a fact question that precluded granting UT-Austin's jurisdictional plea. CR.315. In the court's view, a jury might believe that Henry not only saw the inattentive pedestrian trip, but also that he blamed the fall on a particular expansion joint, which later turned out to be the same expansion joint on which Bellinghausen tripped. But no evidence supports that interpretation. Indeed, it is wholly implausible in light of the undisputed facts.

At his deposition, Henry testified that he told Officer Gonzalez that he had earlier witnessed the inattentive pedestrian trip in the same vicinity, not that he identified the cause of the inattentive pedestrian's fall at the same time. CR.119 (63:11-64:1). His testimony is supported by the audio portion of the video from Officer Gonzalez's squad car, in which Henry can be heard stating that someone else had fallen "right there"

20

earlier that day.  CR.276 (50:15-23).  Bellinghausen has admitted that "Henry told the investigating officer that the man fell earlier 'right there.'" CR.220 (Pl.'s Resp. at ¶ 1).

After Bellinghausen fell, Henry saw the uneven expansion joint and told Officer Gonzalez that, a few hours earlier, he had seen the inattentive pedestrian fall on all fours "right there"—that is, in approximately the same location.  CR.276 (50:20-23).  Henry then told the officer that he had taken a picture of the uneven sidewalk and would submit a request to have the sidewalk repaired, remarked that "we've got a lot of this on campus," and went back to work.  CR.280-81 (54:16-55:11).  Afterwards, an unidentified speaker (not Henry) stated that machines can be used to level an uneven expansion joint, but there's a limit to what they can do.  CR.281-82 (55:18-56:12).

In his report, Officer Gonzalez wrote that Bellinghausen "said he was walking on the sidewalk when he tripped over *a protruding crack* in the sidewalk."  CR.100 (emphasis added).  Later in the report, the officer wrote that Henry had seen the inattentive pedestrian trip on "the same protruding crack," presumably to indicate that Henry had earlier seen the pedestrian trip in the same location where Bellinghausen later tripped. *Id.*  The reference to "the same protruding crack" did not purport to capture Henry's words verbatim; instead, it reflects that Officer Gonzalez used Henry's statement ("right there") to identify the uneven expansion joint as both the *location* where Henry had seen the inattentive pedestrian trip as well as (in hindsight) the presumed *cause* of both falls.

21

Significantly, the report does not say that Henry identified the expansion joint as the cause of the inattentive pedestrian's fall *at the time the pedestrian fell.* CR.100. To interpret the report in that way would require one to believe that Henry not only perceived the expansion joint from a distance of 150 feet but also somehow identified it as unreasonably dangerous from that vantage point. As discussed above, no reasonable fact-finder could believe either proposition. *See supra* Part II.D.1.

### 3. The bare fact that an inattentive pedestrian has fallen does not imply an unreasonably dangerous sidewalk.

The trial court apparently believed that observing the inattentive pedestrian fall may have been sufficient to make Henry aware that the sidewalk was defective in that location. CR.315. But it "is common for the surfaces of streets, sidewalks, and parking lots to be irregular." *Reed v. Wal-Mart Stores, Inc.*, 708 So. 2d 362, 363 (La. 1998). For that reason, pedestrians must watch where they are walking to "avoid tripping over minor unevenness and cracks that inevitably arise in sidewalks." *Girdler v. United States*, 923 F. Supp. 2d 168, 194 (D.D.C. 2013); *see Putman v. Vill. of Bensenville*, 786 N.E.2d 203, 208 (Ill. App. Ct. 2003) ("In a 'busy commercial district,' it is reasonable to infer that a pedestrian could be sufficiently distracted to overlook an otherwise de minimis defect.") (quoting *Baker v. City of Granite City*, 394 N.E.2d 33 (Ill. App. Ct. 1979)). Even pedestrians who are merely *talking* on their cell phones sometimes fail to perceive tripping hazards that an attentive pedestrian would spot. *See e.g.*, *Matthews v. Vlad Restoration Ltd.*, 904 N.Y.S.2d

22

391, 391 (N.Y. App. Div. 2010) (pedestrian distracted by cell-phone conversation tripped over "open and obvious" scaffold brace). Accordingly, no reasonable fact-finder could believe that seeing the inattentive pedestrian fall actually informed Henry that the sidewalk presented an unreasonably dangerous condition.

Henry testified that the inattentive pedestrian "had his phone out and . . . appeared to be either checking voice mail or texting" when he fell. CR.116 (26:20-22). Thus, Henry didn't know if the pedestrian "tripped and fell over his feet or the sidewalk or a stick." CR.119 (65:16-17). In light of the pedestrian's distracted state, Henry had no reason to believe that an unreasonably dangerous sidewalk had caused the man to trip. *See Hayes*, 327 S.W.3d at 117 (university "had no reason to know" that chain across roadway could be dangerous to road users).

"[A]t best, the circumstantial evidence 'creates nothing more than a mere suspicion' that the University was aware of a condition on the walkway that presented an unreasonable risk of harm." *Sampson*, 2014 WL 3893085, at *7 (quoting *Univ. of Tex. at El Paso v. Muro*, 341 S.W.3d 1, 6 (Tex. App.—El Paso 2009, no pet.)). That cannot be the basis of a fact issue regarding actual knowledge. *See Aguilar*, 251 S.W.3d at 514 (university's actual knowledge that an outdoor water hose lying across a sidewalk presented an unreasonably dangerous condition could not be inferred from its knowledge of a safety manual that warned of a tripping hazard posed by flexible cords); *Gonzalez*, 82 S.W.3d at 330 (evidence that TxDOT knew that stop signs had been

23

repeatedly removed by vandals in the weeks before the accident "does not indicate, either directly or by reasonable inference, that TxDOT actually knew the signs were down before the accident occurred"); *Muro*, 341 S.W.3d at 5-6 (evidence that a metal sign post had been removed using the same "flushing" technique that was used by the university's maintenance crews was no evidence that the university had actual knowledge of a dangerous condition). Even if one could say that seeing the pedestrian fall *should have* informed Henry that the sidewalk was dangerous, or that he *should have* walked over to investigate that possibility, that would be no evidence that Henry *actually knew* of an unreasonably dangerous condition. *See Hayes*, 327 S.W.3d at 117; *Am. Indus. Life Ins. Co. v. Ruvalcaba*, 64 S.W.3d 126, 142 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (evidence that premises owner should have known that an open-bannister staircase was unreasonably dangerous was no evidence of actual knowledge) (citing *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 162 (Tex. 1995)).

And even if Henry somehow could have divined that the inattentive pedestrian tripped on an uneven sidewalk, a reasonable factfinder could not infer that Henry therefore actually knew that the sidewalk was unreasonably dangerous. As Henry acknowledged, there are uneven sidewalks in many places on the UT-Austin campus, any one of which could pose a potential tripping hazard to an unwary pedestrian—as do curbs, speed bumps, and similar ground-level elements. *See, e.g.*, *Heflin v. Am. Home Wildwood Estates, L.P.*, 936 So.2d 226, 232 (La. App. 2006) (noting that "speed

24

bumps . . . create a hazard to inattentive pedestrians"). But few (if any) such elements can be said to pose the *unreasonable* danger required to waive the University's immunity. *See, e.g.*, *Brinson Ford*, 228 S.W.3d at 162-63 (pedestrian ramp that was partially unprotected by handrails but marked with yellow paint along its edges was, as a matter of law, not an unreasonably dangerous condition). Accordingly, the mere fact that Henry saw the inattentive pedestrian fall is no evidence that Henry knew the sidewalk was unreasonably dangerous.

4. **No reasonable juror could believe that Henry knew that the sidewalk was unreasonably dangerous but Bellinghausen did not.**

Bellinghausen himself testified that he did not perceive the expansion joint as dangerous, even when he was directly on top of it, and there is no reason to doubt his testimony in that regard. CR.86 (99:5-7). Bellinghausen did not trip and injure himself on purpose. Moreover, as the photograph clearly indicates, the sidewalk imperfection was relatively minor and could easily be overlooked even at close range. App. D.

For that very reason, however, no reasonable fact-finder could believe that Henry, from at least 150 feet away, perceived as unreasonably dangerous a sidewalk that Bellinghausen himself perceived as safe as he approached and walked on the uneven expansion joint. Neither Texas law nor common sense supports such an absurd result. *Cf. Wal-Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709 (Tex. 2003) (per curiam) ("If the

25

licensee has the same knowledge about the dangerous condition as the licensor, then no duty to the licensee exists."). Yet the trial court's ruling implicitly contemplates as much.

In order for a fact dispute to exist regarding whether UT-Austin had actual knowledge of an unreasonably dangerous condition, one would have to believe:

- that Henry actually knew that an expansion joint, rather than preoccupation with his mobile phone, had caused the inattentive pedestrian to trip;

- that Henry somehow perceived, while working at least 150 feet away, that the expansion joint shown in Appendix D was an unreasonably dangerous condition; and

- that the same unreasonably dangerous condition that Bellinghausen failed to perceive at point-blank range was evident to Henry from 150 feet away.

Each of these inferences is, on its own, unreasonable. Together they are simply absurd.

Texas law does not permit parties to create a fact issue by piling up a series of unreasonable inferences. *Schlumberger Well Surveying*, 435 S.W.2d at 858; *see Gonzales v. Hearst Corp.*, 930 S.W.2d 275, 282-83 (Tex. App.—Houston [14th Dist.] 1996, no writ) (finding it unreasonable to infer that reporter acted with malice when he published story identifying police officer by an incorrect first name, in light of evidence showing that reporter spoke with four different police officers and three different police departments about underlying events); *see also id.* at 284 ("The error, when considered in context, points not to actual malice, but to mistake or negligence."). And "when the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or

suspicion of its existence, such evidence is in legal effect no evidence." *Seideneck v. Cal Bayreuther Assocs.*, 451 S.W.2d 752, 755 (Tex. 1970); *see also Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 928 (Tex. 1993) (noting that courts "are not empowered to convert mere suspicion or surmise into some evidence"). Accordingly, the trial court erred in concluding that a fact issue exists regarding whether UT-Austin had prior actual knowledge of an unreasonably dangerous condition.

### 5. Henry's clarification regarding what he told Officer Gonzalez does not create a fact question about what he knew.

When Plaintiff's counsel reviewed the police report with Henry at his deposition, Henry confirmed certain observations in the report as being consistent with what Henry himself had observed at the scene, but Henry had not spoken with Bellinghausen and could not corroborate several of Bellinghausen's statements that Officer Gonzalez reported. CR.262-66 (36:16-38:16; 39:14-40:14). For example, Henry could not confirm that Bellinghausen told Officer Gonzalez that "he was walking on the sidewalk when he tripped over a protruding crack in the sidewalk." CR.264 (38:13-16). But Henry did not disagree with anything Officer Gonzalez had written in the report, including the statement that Henry "said that he saw another person trip and fall on the same protruding crack about 9 a.m." CR.266 (40:1-6).

Henry later clarified that he did not tell Officer Gonzalez that both falls were caused by the same crack. CR.119 (63:23-64:1). Instead, he told the officer that the falls

27

occurred in the same area. *Id.* (63:15-20). In the trial court, Bellinghausen argued that Henry's clarification created "a clear issue of witness credibility" and a disputed issue of material fact regarding whether the University had actual knowledge of an unreasonably dangerous condition. CR.221-22 (Pl.'s Resp. at ¶ 5). The trial court evidently agreed with Bellinghausen. CR.315. But Bellinghausen is mistaken for several reasons.

First, what Henry actually told Officer Gonzalez cannot reasonably be disputed because it is audible on the police video; he said that the inattentive pedestrian had fallen "right there." CR.276 (50:15-23). Indeed, Plaintiff's counsel acknowledged that those were Henry's actual words. CR.120 (67:3-8); CR.220 (Pl.'s Resp. at ¶ 1). When one reads the police report in light of that undisputed evidence, it becomes apparent that Officer Gonzalez simply took the "protruding crack" language that he had used earlier in reporting Bellinghausen's statement identifying the crack as the cause of his fall, and used the same phrase to identify the location where Henry reported having seen the inattentive pedestrian fall earlier that day.

Moreover, the relevant question ultimately is what Henry himself actually knew at the time Bellinghausen fell, and on that question there exists no disputed fact issue. Bellinghausen introduced no evidence to rebut Henry's testimony that he saw the inattentive pedestrian fall from a distance of at least 150 feet; that Henry did not go over to help the man because he walked away unhurt; that Henry did not actually see from that distance what had caused the man to trip; and that it was not until after

28

Bellinghausen fell that Henry approached the accident scene and perceived, for the first time, the uneven sidewalk that apparently caused both men to fall.

* * * *

Merely observing that an inattentive pedestrian has fallen, without more, does not inform an observer that the sidewalk is dangerously defective. No fact-finder could reasonably believe that David Henry's distant observation of an inattentive pedestrian falling gave the University actual knowledge that an unreasonably dangerous condition existed on the sidewalk. Because there is no genuine fact dispute on that issue for a jury to resolve, the trial court should have granted the University's jurisdictional plea.

## PRAYER

The Court should vacate the trial court's order denying UT-Austin's jurisdictional plea and dismiss Bellinghausen's claims for lack of subject-matter jurisdiction.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

SCOTT A. KELLER
Solicitor General

  /s/ Joseph D. Hughes
JOSEPH D. HUGHES
Assistant Solicitor General
State Bar No. 24007410

JASON WARNER
Assistant Attorney General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1729
Fax: (512) 474-2697
*jody.hughes@texasattorneygeneral.gov*

COUNSEL FOR APPELLANT

## CERTIFICATE OF SERVICE

I certify that on February 12, 2015, an electronic copy of this brief was served on the following counsel via File&ServeXpress.

Robert Ranco
THE CARLSON LAW FIRM, P.C.
11606 N. IH-35
Austin, Texas 78753
*rranco@carlsonattorneys.com*

COUNSEL FOR PLAINTIFF/APPELLEE,
WILLIAM A. BELLINGHAUSEN, JR.


   /s/Joseph D. Hughes
Joseph D. Hughes


## CERTIFICATE OF COMPLIANCE

In compliance with Texas Rule of Appellate Procedure 9.4(i)(2), I certify that this brief contains 7,259 words, excluding the portions exempted by Rule 9.4(i)(1). In making this certification, I am relying on the Word Perfect 12 software used to prepare the brief.


   /s/ Joseph D. Hughes
Joseph D. Hughes

# Appendix

## APPENDIX TABLE OF CONTENTS

**TAB**

Nov. 21, 2014 Order Denying Defendant UT-Austin's Plea to the
Jurisdiction and Motion to Dismiss (CR.317) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A

Photograph showing Skilled Social Work building in background,
looking southwest across East 20th Street (CR.91) . . . . . . . . . . . . . . . . . . . . . . . . B

Photograph showing Mr. Bellinghausen receiving treatment (CR.93) . . . . . . . . . . . C

Photograph showing close-up of uneven sidewalk (CR.95) . . . . . . . . . . . . . . . . . . . D

Narrative Report of Sgt. Roberto Gonzalez, UTPD (CR.100) . . . . . . . . . . . . . . . . . E

Tab A

Filed in The District Court
of Travis County, Texas

NOV 21 2014

At _____ 3:11 ρ M.
Amalia Rodriguez-Mendoza, Clerk

CAUSE NO. D-1-GN-13-002198

| | | |
|---|---|---|
| WILLIAM A. BELLINGHAUSEN, JR., Plaintiff, | § § § | IN THE DISTRICT COURT OF |
| VS. | § § § | TRAVIS COUNTY, TEXAS |
| THE UNIVERSITY OF TEXAS AT AUSTIN, Defendant. | § § § § | 250TH JUDICIAL DISTRICT |

## ORDER ON DEFENDANT UNIVERSITY OF TEXAS AT AUSTIN'S PLEA TO THE JURISDICTION AND MOTION TO DISMISS

On ___November 20___, 2014, the Court heard Defendant UNIVERISTY OF TEXAS AT AUSTIN's Plea to the Jurisdiction and Motion to Dismiss in this cause. The Court, after examining the pleadings and evidence before it, and hearing the argument of counsel, finds that Defendant's Motions should be and are hereby DENIED.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that the Court denies all relief not expressly granted in this judgment.

SIGNED on ___November 21___, 2014.

_____
PRESIDING JUDGE

317

Tab B



Tab C





2011/08/27



PENGAD 800-631-6989

EXHIBIT

2

Bellinghausen

Tab D



Tab E

| THE UNIVERSITY OF TEXAS POLICE DEPARTMENT | Page | 2 | Case No. | 1109591 |
|---|---|---|---|---|
| | | | Type: | Incident |

| Crime / Incident ILL PERSON INCIDENT Sick/III Person | Attempt ☐ | Narrative Report |
|---|---|---|

On 08/27/2011 at about 12:33pm I was dispatched to Lot 80, north west corner near the Recreational Sports Center (RSC), for a report of a medical emergency. Dispatch advised an older white male subject was down and bleeding from the head. Due to the serious nature of the injury I responded to the scene Code 2.

Upon arrival I noticed a male subject lying against a tree on the south east sidewalk of RSC. There were a few UT employees trying to help the male subject. Austin - Travis County Emergency Medical Services Unit 3 arrived on scene.

The male subject was bleeding from the face and neck. He also appeared to be complaining of a hurt shoulder and ribs. He was later identified as William Bellinghausen (non UT affiliated).

EMS began to treat Bellinghausen for his injuries. Bellinghausen was dressed in a Boy Scout Troop Leader uniform and said he was on his way to an event with the kids. Bellinghausen said he was walking on the sidewalk when he tripped over a protruding crack in the sidewalk. Bellinghausen requested that photos of the crack be taken with his digital camera.

EMS placed Bellinghausen on the stretcher and treated him inside the ambulance. Bellinghausen was later transported to Brackenridge Hospital due to his injuries.

I spoke with the reporting person, Parking and Transportation (P&T) staff member Elaina Spriggs, and she told me that she was sitting at the Lot 80 entrance when she heard someone fall just across the street. She looked over and saw a man lying on the ground. She went over to help Bellinghausen and called 911 requesting EMS.

I spoke with another P&T staff member that was working in Lot 80. Kathryn Shelton told me that earlier she saw Bellinghausen walking along the sidewalk very slowly then when she heard a noise she turned to look back. Shelton saw Bellinghausen trip forward and fall flat on the ground with his head also touching the ground. Shelton said he began to roll over and eventually came to a rest near the grass. Shelton said Bellinghausen was not moving after the fall so Shelton and Spriggs went over to help him up.

A Facilities staff member, David Henry, was working nearby all morning and said that he saw another person trip and fall on the same protruding crack at about 9:00am. The subject appeared to be a white male in his mid 30's. Henry said the subject fell forward and ended up on all fours.

Henry said he would put in a work order to level down the sidewalk.

I took photos of the sidewalk area, sidewalk crack, and Bellinghausen. They are attached to the report.

Nothing further

| Officer ID: SGT ROBERTO GONZALEZ | 1534 | Reviewed By: SGT Christopher Myers | Date: 08/28/2011 13:01:48 |
|---|---|---|---|